889 A.2d 1066 (2006)
382 N.J. Super. 433
Dorrett HITCHMAN, Phyllicia Brown, an infant by her Guardian Ad Litem Phyllis Brown and Phyllis Brown, Individually, and Pete Brown, Her Husband Per Quod, Denise Wilson and James Wilson, Her Husband Per Quod, Plaintiffs-Respondents,
v.
Robert NAGY and Joseph Abbott, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 2005.
Decided January 23, 2006.
*1068 Eugene M. Purcell, Bedminster, argued the cause for appellants (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; Mr. Purcell, of counsel and on the brief).
Frank J. Zazzaro, Montclair, argued the cause for respondents.
Before Judges STERN, PARKER and SAPP-PETERSON.
*1069 The opinion of the court was delivered by
PARKER, J.A.D.
Defendants Robert Nagy and Joseph Abbott appeal from a pre-trial order entered on August 8, 2003, denying their motion for summary judgment; a judgment entered against them on March 1, 2004, after a jury trial; and a post-trial order entered on May 5, 2004, denying defendants' motion for a new trial or for judgment notwithstanding the verdict (J.N.O.V.) pursuant to R. 4:40-1 and -2.
Plaintiff and defendants were involved in an automobile accident on August 20, 1999. Plaintiff was diagnosed as having suffered disc herniations at C3-4, C4-5 and C5-6, along with straightening of the normal curvature of the cervical spine as a result of the accident. Apparently, there was no dispute that she suffered a permanent injury. The jury rendered a verdict in plaintiff's favor, awarding $100,000.
On February 27, 2004, defendants moved for a new trial or, alternatively, J.N.O.V. After hearing oral argument, the trial judge rendered a written decision denying the motion. An order memorializing the decision was entered on May 5, 2004. In this appeal defendants argue (1) their pre-trial motion for summary judgment should have been granted because plaintiff failed to satisfy the "serious impact" prong of Oswin v. Shaw, 129 N.J. 290, 609 A.2d 415 (1992); (2) the trial judge improperly injected racial issues into the jury selection process and prohibited defense counsel from using peremptory challenges; and (3) the trial judge improperly injected racial issues into the cross-examination of defendants' expert doctor.

I
Defendants' first point may be disposed by virtue of the Supreme Court's decision in DiProspero v. Penn, 183 N.J. 477, 481, 874 A.2d 1039 (2005), which held that the plain language of the Automobile Insurance Cost Reduction Act (AICRA), N.J.S.A. 39:6A-1.1 to -35 or 39:6A-8(a), does not contain a serious life impact standard and that a plaintiff need only demonstrate a permanent injury to satisfy the verbal threshold. We subsequently held that DiProspero afforded "pipeline retroactivity" to "all pre-judgment matters pending in the trial courts and to those matters that are on direct appeal." Pungitore v. Brown, 379 N.J.Super. 165, 169, 877 A.2d 305 (App.Div.2005); Beltran v. DeLima, 379 N.J.Super. 169, 176-77, 877 A.2d 307 (App.Div.2005). Since this matter was pending appeal when DiProspero was decided by the Supreme Court, this argument is rendered moot. R. 2:8-2.

II
The second issue on appeal arose during the course of jury selection. The jury pool included three African-American women. After exercising one peremptory challenge excusing a white male, defense counsel exercised a second challenge excusing an African-American woman. Immediately after defense counsel exercised the challenge, the following colloquy occurred between the court and defense counsel:
THE COURT: Juror number 7. ... [Defense counsel], let me see you at side bar. [Plaintiff's counsel], let me see you at side bar.

(Side Bar)
THE COURT: Just so that the record is clear, you've just excused the black juror. I have a black plaintiff. In order to protect the class, you've got to put on the record the reasons why you excused her.
[DEFENSE COUNSEL]: Your Honor, I excused her for the same reason that I *1070 excused the white male juror. Just struck me as a person who would be generous to the plaintiff.
THE COURT: How do you know that?
[DEFENSE COUNSEL]: I don't know that. I don't know if the white male would have been generous to the plaintiff or not.
THE COURT: You're going to have a better reason next time you excuse a member of a protected class, especially when it's a black juror and you have a black plaintiff. Just your own gut feeling is not going to be enough in my court room.
[DEFENSE COUNSEL]: Your Honor 
THE COURT: If there was something she said or something that had background that would point to that, that's fine, but just say  just say 
[DEFENSE COUNSEL]: Your Honor, I would ask that you keep your voice down.
THE COURT: Pardon me?
[DEFENSE COUNSEL]: I would ask Your Honor that  I think the people can hear what you're saying.
THE COURT: I don't think so, but I know you can hear it and you're not happy with it, but guess what, I don't like people who excuse black jurors in a situation where I have a black plaintiff because that leads to charges later on, counselor. Charges that are perhaps not founded.
That's why the case was decided the way it was, and that's why I ask you to put the reasons on the record and to tell me I think that she's going to be too generous is not enough for me. I need specific reasons based on the facts that you have on this juror.
[DEFENSE COUNSEL]: Beyond the fact that I believe, Your Honor, there has to be an indication of some kind of pattern before this kind of unfortunate accusation is made, she was a third grade teacher. The plaintiff works with children at the school  at the religious school that she works at 
THE COURT: That's all you have to tell me. You see, now you're giving me a valid excuse.
[DEFENSE COUNSEL]: Your Honor, I'm very disturbed. I really am.
THE COURT: You should be. Just like I was disturbed when you gave the first reason, but when you give me that kind of a reason, now I can say absolutely correct. If the situation is she's a third grade teacher. The plaintiff is a teacher  children, and therefore, there might be some kind of a situation there where there might be some  I can understand that, but you have to give me some reasons, counselor.
[DEFENSE COUNSEL]: Well, Your Honor, I believe that this entire discussion is premature. There's two other black women 
THE COURT: It's never premature, counselor. Not in my book.

(Side Bar Concluded)
Juror number seven was then excused and replaced by another African-American female. Defense counsel did not seek to excuse the second African-American woman nor did he state any further objections to the trial judge's intervention. The remaining jurors were selected without incident.
In their motion for a new trial, defendants argued that the trial court improperly injected racial issues into the jury selection, depriving them of a fair trial. The trial judge, in his written decision, concluded that he had the authority to "sua sponte contest a peremptory challenge by a party even if the opposing party has failed to do so. It is this court's duty to ensure the ends of justice and to guarantee that every *1071 litigant, including a litigant of a protected class, has a fair trial by an impartial jury that is a representative cross-section of the community."
We begin our analysis of the peremptory challenge issue with the United States Supreme Court decision in Batson v. Kentucky in which the Court held, "[t]he Equal Protection clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69, 83 (1986). The principles of Batson were extended to civil trials in the interest of protecting each juror's equal protection right to be free from "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." J.E.B. v. Ala. ex rel. T.B., 511 U.S. 127, 128, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89, 96 (1994). While Batson set the parameters for the exercise of peremptory challenges, it did not specifically instruct state courts how best to implement them. 476 U.S. at 99 n. 24, 106 S.Ct. 1712.
The New Jersey Supreme Court molded its peremptory challenge jurisprudence on the state constitutional right to "trial by an impartial jury drawn from a representative cross-section of the community." State v. Gilmore, 103 N.J. 508, 522-23, 511 A.2d 1150 (1986). The Court explicitly divorced its peremptory challenge jurisprudence from Batson's equal protection underpinnings:
We refer to federal constitutional law only as establishing the floor of minimum constitutional protection. Furthermore, when we cite federal or other state court opinions in construing the provisions of our Constitution, we rely upon them merely for the purpose of guidance, not as compelling the result we reach on independent state grounds.
[Id. at 523-24, 511 A.2d 1150].
The Court cautioned, however, that "[t]he representative-cross-section rule by itself is insufficient to insure an impartial jury. . . . On the other hand, the representative-cross-section rule, applied unflinchingly, exalts demographic representativeness above the overall impartiality it aims to further." Id. at 530, 511 A.2d 1150. In formulating the procedures for trial courts to monitor the exercise of peremptory challenges, the Court noted:
We must be careful not to place on the defendant a crippling burden of proof that is so inaptly tailored to the right to trial by an impartial jury in all criminal prosecutions that it effectively leaves the defendant a "right" without a remedy.
At the same time, we must be cautious not to discourage the prosecutor from using peremptory challenges in all proper instances to further, though not to undermine, the right to trial by an impartial jury. In aiming for this mean, we adapt to this context (rather than directly adopting) the burden-of-proof rules fashioned in "disparate treatment" cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000e-17. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
[Id. at 533-34, 511 A.2d 1150].
The Court in Gilmore articulated a burden-shifting test that begins with the rebuttable presumption that the party exercising the peremptory challenge did so on permissible grounds. This presumption may be rebutted upon a party's prima facie showing that the peremptory challenge was exercised on constitutionally-impermissible grounds, meaning that the party objecting to the peremptory challenge *1072 "must establish that the potential jurors wholly or disproportionately excluded were members of a cognizable group within the meaning of the representative cross-section rule." Id. at 535-36, 511 A.2d 1150. If a prima facie case is established, the burden then shifts back to the party exercising the challenge to provide evidence that the "challenges under review are justifiable on the basis of concerns about situation-specific bias;" that is, the party "must articulate `clear and reasonably specific' explanations of its `legitimate reasons' for exercising each of the peremptory challenges." Id. at 537, 511 A.2d 1150 (quoting Burdine, supra, 450 U.S. at 258, 101 S.Ct. at 1096, 67 L.Ed.2d at 218). These reasons "need not rise to the level justifying challenges for cause." Gilmore, supra, 103 N.J. at 538, 511 A.2d 1150. The trial court must judge the prima facie case against the rebuttal "to determine whether the [proponent] has carried the ultimate burden of proving, by a preponderance of the evidence," that the challenge was exercised on "constitutionally-impermissible grounds of presumed group bias." Id. at 539, 511 A.2d 1150.
The burden-shifting test is intended to secure the "right to trial by an impartial jury drawn from [a] representative cross-section of the community." Id. at 543, 511 A.2d 1150. In short, the "goal of peremptory challenges is to secure an impartial jury." State v. DiFrisco, 137 N.J. 434, 468, 645 A.2d 734 (1994), cert. denied, 516 U.S. 1129, 116 S.Ct. 949, 133 L.Ed.2d 873 (1996). A constitutionally-impermissible challenge, therefore, "may not be treated as harmless error." Gilmore, supra, 103 N.J. at 544, 511 A.2d 1150. Although Gilmore was a criminal case, its core principles are equally applicable to civil actions. Russell v. Rutgers Cmty. Health Plan, 280 N.J.Super. 445, 453, 655 A.2d 948 (App.Div.), certif. denied, 142 N.J. 452, 663 A.2d 1359 (1995).
We have no doubt that a trial judge has the authority to raise the issue of racial bias in the exercise of peremptory challenges sua sponte. Indeed, we agree with the trial judge's conclusion that it is the "court's duty to ensure the ends of justice and to guarantee that every litigant, including a litigant of a protected class, has a fair trial by an impartial jury that is a representative cross-section of the community." (Emphasis added). Our concern is with the question of when the trial court's duty to raise the issue sua sponte is triggered.
Since this issue has not been addressed in New Jersey, we look to other states that have considered it. The Washington Court of Appeals was presented with the question of whether a trial judge may raise a Batson issue sua sponte and whether the trial judge improperly raised the issue before a prima facie case of invidious discrimination was shown. State v. Evans, 100 Wash.App. 757, 998 P.2d 373, 375-76 (2000). There, a criminal defense attorney excused a minority juror in his exercise of one peremptory challenge. The court sua sponte required counsel to provide an explanation for the challenge  an explanation the judge ultimately rejected. Id. at 376. The Court of Appeals held that "a trial court, in the sound exercise of its discretion, may raise a Batson issue sua sponte." Id. at 380. It found, however, that the trial judge erred by requiring a race-neutral explanation for the exercise of a single peremptory challenge. Ibid. The Washington court was reluctant "to view the exercise of a peremptory challenge against a person of color, without more, as sufficient to establish a prima facie case." Id. at 381. The problem with equating a mere challenge to a single person of color with a prima facie case is that to do so improperly eliminates the first *1073 prong of the Batson test.[1]Id. at 380-82. A sua sponte Batson hearing absent a prima facie case represents an erroneous directive by the trial judge. Id. at 381. The Washington court held that "`[i]ntervention sua sponte is only authorized when a prima facie case is abundantly clear with respect to a particular juror.'" Id. at 382 (quoting Williams v. State, 669 N.E.2d 1372, 1382 (Ind.1996), cert. denied, 520 U.S. 1232, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997)). The court declined to apply a harmless error standard when the juror was excused without evidence that the peremptory challenge was exercised on constitutionally-impermissible grounds, and determined that it was "reversible error without a showing of prejudice." Id. at 383.
The Michigan Supreme Court addressed a similar issue in People v. Bell, 473 Mich. 275, 702 N.W.2d 128, 134 (2005). There, in the murder trial of an African-American defendant, defense counsel attempted to excuse a third consecutive white juror and the trial court, sua sponte, raised the Batson issue. Id. at 131. After hearing defense counsel's race-conscious justification, the trial court disallowed the challenge and reseated the juror. In reviewing the matter, the Michigan Court held that the trial judge did not err in disallowing the race-conscious peremptory challenge. Id. at 130. The prima facie case was self-evident because the trial court "specifically stated that it was disallowing the challenges because [opposing] counsel, for the better part of the day, had only excused Caucasian male jurors." Id. at 135. In doing so, however, the Court made clear that a "trial court may [only] make an inquiry sua sponte after observing a prima facie case of purposeful discrimination through the use of peremptory challenges." Id. at 134 (emphasis added).
In Indiana, the Supreme Court addressed a trial court's imposition of "a requirement that, in order to exercise a peremptory challenge, the party attempting that challenge must give to the court a race, ethnic, religious, sex-neutral reason for the challenge." Williams, supra, 669 N.E.2d at 1376. There, the Court found no reversible error but provided the following guidance for future cases:
[A]bsent extraordinary circumstances a trial court should not require each side to present a race-neutral justification for each of its peremptory challenges. Trial courts should wait for an objection by an opposing party before deciding whether a prima facie case of discrimination is made and demanding a race-neutral explanation. Intervention sua sponte is only authorized when a prima facie case is abundantly clear with respect to a particular juror. Obviously, a judge who adopts a blanket policy of demanding explanations, as the court did here, would not have articulated a particularized showing and would commit error.
[Id. at 1382 (emphasis added)].
The Pennsylvania Supreme Court considered the case of an African-American criminal defendant seeking a new trial because the trial judge sua sponte raised a Batson issue and denied a peremptory challenge to excuse a white juror. Commonwealth v. Carson, 559 Pa. 460, 741 A.2d 686, 693 (1999), cert. denied, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000). There, the trial court seated the juror because [opposing] counsel justified his exercise of the peremptory challenge by stating, "there was something about the juror's face that made him feel she was untrustworthy." Ibid. The Pennsylvania Court held that the "trial court is duty *1074 bound to make a sua sponte inquiry after observing a prima facie case of purposeful discrimination by way of peremptory challenges." Id. at 695. (Emphasis added).
Against this legal framework, defendants argue that while a trial court may, sua sponte, initiate a Batson/Gilmore inquiry, it may do so only after identifying a prima facie showing of discrimination. We agree. Trial courts "must be cautious not to discourage the [attorneys] from using peremptory challenges in all proper instances to further, though not to undermine, the right to trial by an impartial jury." Gilmore supra, 103 N.J. at 533, 511 A.2d 1150. Requiring the trial court to identify a prima facie case of discrimination before initiating a Batson/Gilmore inquiry will avoid a chilling effect on counsel's further exercise of peremptory challenges.
Here, with three African-American women in the jury pool, the trial judge sua sponte questioned defendants' exercise of a single peremptory challenge against juror number seven, an African-American woman. In our view, there was no prima facie evidence of discriminatory intent when defense counsel exercised his challenge to excuse juror number seven. Once the judge initiated the inquiry, however, defense counsel provided a non-discriminatory reason for excusing the juror and the judge sustained the challenge. Consequently, the error was harmless.
If the judge had seated the juror, however, the unprovoked sua sponte inquiry would have resulted in reversible error. Gilmore, supra, 103 N.J. at 544, 511 A.2d 1150. In order to avoid reversible error in the future, trial judges are advised to avoid a Batson/Gilmore inquiry without some evidence of discriminatory intent in the exercise of a peremptory challenge. Here, defense counsel had only exercised one previous challenge, excusing a white male juror. Juror number seven was the first minority juror defense counsel sought to excuse. We see nothing in the record to justify a Batson/Gilmore inquiry under the circumstances presented.

III
Defendants next argue that the trial judge improperly injected racial issues into defendants' cross-examination of their expert, depriving them of a fair trial. After voir dire and qualification of Dr. Douglas Chalmers, defendants' expert in orthopedic surgery, defense counsel asked him about his examination of plaintiff. Chalmers responded:
A. Well, the history was that of a thirty-seven-year-old Jamaican woman. She was seen incidentally in the company of two individuals who had been involved in the same motor vehicle accident, which took place or occurred on August 20th, 1999.
The doctor went on to explain what plaintiff reported to him and his use of the various diagnostic tools, including X-rays and MRIs. At the conclusion of Chalmers' direct testimony, the judge called counsel into chambers and the following exchange occurred:
THE COURT: All right. Counsel, I called you into chambers a few minutes ago, and I advised you of the fact that in his direct examination at the very beginning after he was qualified as an orthopedic surgeon by the court, in response to really the first question  by the defense or on direct, he said within a reasonable degree of medical probability, he talks about the fact that he did this IME on March 21st, 2003, and that he observed a thirty-seven-year old Jamaican woman who had been involved in a motor vehicle accident, which she was struck from behind, her car was struck from behind, etc., etc., etc.

*1075 What struck me with respect to that testimony is the fact that he used the term, "thirty-seven-year-old Jamaican woman." No basis for the conclusion that she's Jamaican, number one. Number two, I need to know and I wanted to have the record clear as to why it is that the fact that this lady is of Jamaican extraction is relevant and material to any issue before this jury.
So I have advised both attorneys of my concern with regards to that, and they may question the doctor about it. If they don't, I have advised them that I think I have an obligation as the judge to make sure that any inferences that may be drawn from the fact that she's Jamaican either for her or against her would not be proper, would be based on a race factor and absolutely would be a miscarriage of justice.
And, therefore, I intend to question the doctor as to the relevancy of that statement, that observation in this matter, and of course, his ultimate conclusions as to the fact that she was not injured in this accident that occurred back in 1999.
Do you wish to be heard? [plaintiff's counsel], I'll allow you first.
[PLAINTIFF'S COUNSEL]: Judge, no, only to say that I didn't think it was necessary for him to characterize her as  or say that she was Jamaican. I don't know how he knew she was Jamaican, and I can tell you that my client, Ms. Hitchman, did express to me grave concern about the fact that Dr. Chalmers did say that she was a thirty-seven-year-old Jamaican woman.
One of the things that my client said to me was that I'm a hardworking person, I've worked all my life, and I've completed college 
THE COURT: It has nothing to do with whether she's a hardworking person or not. It's just I don't know the relevancy of bring somebody's race into the cases 
[PLAINTIFF'S COUNSEL]: Right, judge.
THE COURT:  into the testimony. I mean, it bothers me, and I think it has to be clarified before the jury.
[PLAINTIFF'S COUNSEL]: I'm concerned it may unfairly paint her as I don't know, whatever.
THE COURT: [Counsel]?
[DEFENSE COUNSEL]: Your Honor, as a preliminary matter, I note that I forgot to mark the report, and I think in view of this issue, it's important that I do that. He mentioned her as a Jamaican woman. In fact, his report says, the first sentence, "this thirty-seven-year-old Jamaican woman was seen in the company of two additional individuals." No 
THE COURT: Who were also  who were also in the accident, by the way. I didn't miss that part. I got it in my notes, and I thought it was a little prejudicial, but I  you know, there was no objection. So I  and that I  that doesn't bother me, that two other people were there and they were also injured.
[DEFENSE COUNSEL]: And, of course, there's no objection by counsel to the word "Jamaican" in the report. It's like a fifth word in the report. Nobody made any issue out of it before. The report also says that she was driving a Toyota which does not appear by any proofs in this case to be significant. It says that the accident happened in Somerset which, of course, it doesn't matter if it happened in Somerset or anywhere else.
All of these things are mere background; they're not issues in the case. The fact that she's Jamaican is not an issue in the case, and it's of no moment, and to underline this and signify it to *1076 the jury is in my view creating an issue where none exists, and I believe it's improper.
THE COURT: So you do agree with me that there is no relevance and materiality to the fact that this lady is a Jamaican woman?
[DEFENSE COUNSEL]: I agree with that.
THE COURT: I might be able to just charge this jury that they're to disregard that testimony by the doctor.
[DEFENSE COUNSEL]: I would also like to point out 
THE COURT:  because it's not relevant and material to any issue before them.
[DEFENSE COUNSEL]: The  and the other thing I'd like to point out, judge 
THE COURT: Now I could either question him or I could just say, ladies and gentlemen, this doctor said that this lady was a Jamaican woman. He didn't give us any basis for that conclusion, and even if she is Jamaican, it's of no consequence. You're not to consider it in any way.
[DEFENSE COUNSEL]: Judge, if you look at the diagnostic report which has been referred to although not word for word, the first sentence is that she's a thirty-four-year-old [sic] right-handed Afro 
THE COURT: Doesn't matter 
[DEFENSE COUNSEL]:  African-American female.
THE COURT:  I don't care . . . I don't care what's in the reports. I care what goes before the jury because the jury is the one who has to make the decision, and I think what racial profiling being what it is in this state and being what it has been in the [past], I think we have to be very, very careful and we have  this is a court of law.
I have an obligation to make sure that this matter is decided based on the facts and only on the facts and not on any type of racial consideration, and I will not allow anyone, Dr. Chalmers or an attorney or anyone else to use race in any way during a trial.
Now, yesterday, if you remember, we had a little bit of a  of a problem when you excused an African-American female because she was a teacher. The juror that replaced her is an African-American female that's also a teacher. She was not excused.
I don't know what's going on here. I just want the record to be clear, and I want to tell you I will not  as the judge, I believe I have an obligation and a duty and a responsibility to make sure that this lady who is here seeking justice has her case decided based on the facts and nothing but the facts and that no race gets involved in any way that no improper evidence is used by the jurors or by anybody else to decide this matter.
End of story. That's all there is. I don't know why it's relevant. Maybe he has a reason why it's relevant, and I'll ask him for it. I'll ask the doctor what's the relevance of her being Jamaican. Is she different than an Italian-American, a Russian-American, a Norwegian-American other than the color of her skin. All right.
The judge then returned to the courtroom, brought in the jury and proceeded with cross-examination. Plaintiff's counsel never raised the question of why Chalmers referred to plaintiff as a Jamaican woman; nor, did defense counsel request redirect examination of Chalmers to ask the question raised by the judge. After cross-examination, the judge questioned the doctor himself:
THE COURT: Doctor, I have two questions and one can clarify [sic]. You say *1077 that there were long standing degenerative changes. That was your opinion, degenerative changes, long standing degenerative changes you said.
THE WITNESS: Yes.
THE COURT: When you say that, what part of the spine were you talking about?
THE WITNESS: Cervical, the neck.
THE COURT: Only the cervical?
THE WITNESS: Yes. Only the neck.
. . . .
THE COURT: In this case, the degenerative changes, long standing degenerative changes were only for the cervical spine and not for the other and not for the lumbosacral or thoracic or anything else, and  okay.
Now the other question I have, you stated in your findings with the IME several things, and one of the things you stated was that this was a thirty-seven-year-old Jamaican woman. How did you come to the conclusion that she's Jamaican?
THE WITNESS: I asked her.
THE COURT: Okay. And what relevance does that have on your findings as a doctor?
THE WITNESS: None in this case. We were taught in medical school basically to learn the origin or individuals who we evaluated and treated because, more medically than orthopedically, there are certain areas where certain disease entities may be indigenous for example. It may affect that.
In this situation, I was semi-chastised a number of years ago, when I was doing an IME and someone said, you know, basically said I didn't even know where the person was born, and so for that reason, I've made a habit  well with private patients I've always done it but to make it a habit not only to ask but to put it in. I've been 
THE COURT: But, in this particular case, it's of no relevance to the issues before the jury 
THE WITNESS: Zero.
THE COURT: The jury doesn't have to consider that at all and should disregard it.
THE WITNESS: It's absolutely without any significance in this case.
THE COURT: Thank you very much.
Defendants now argue that the judge unfairly characterized Chalmers' testimony in front of the jury to defendants' detriment.
Clearly, a trial judge may intervene in the interest of assuring a fair trial. "Our courts have long rejected the `arbitrary and artificial methods of the pure adversary system of litigation which regards the lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed.'" State v. Medina, 349 N.J.Super. 108, 130, 793 A.2d 68 (App.Div.) (quoting State v. Riley, 28 N.J. 188, 200, 145 A.2d 601 (1958), cert. denied, 359 U.S. 313, 79 S.Ct. 891, 3 L.Ed.2d 832 (1959)), certif. denied, 174 N.J. 193, 803 A.2d 1165 (2002). The "intervention of a trial judge in the questioning of a witness is both a power and a duty, and forms part of the judiciary's general obligation to ensure a fair trial `conducted in [an] orderly and expeditious manner.'" Medina, supra, 349 N.J.Super. at 130-31, 793 A.2d 68 (quoting State v. Laws, 50 N.J. 159, 181, 233 A.2d 633 (1967), cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968)). A trial judge must nevertheless be cautious not to compromise his or her impartiality by taking over the proceedings and creating prejudicial error. Medina, supra, 349 N.J.Super. at 131, 793 A.2d 68. An isolated instance of "judicial annoyance," however, does "not warrant the drastic remedy of vitiating an *1078 otherwise valid [judgment]." Id. at 132, 793 A.2d 68.
Our standard in reviewing a claim of prejudicial intervention by a trial judge is whether "`it appears [the] trial judge has turned the jury against the defendant.'" Mercer v. Weyerhaeuser, 324 N.J.Super. 290, 298, 735 A.2d 576 (App. Div.1999) (quoting State v. Zwillman, 112 N.J.Super. 6, 21, 270 A.2d 284 (App.Div. 1970), certif. denied, 57 N.J. 603, 274 A.2d 56 (1971)). Our scope of review includes considerations of the entire transcript to determine whether "the conduct of the trial judge toward defense counsel `tended strongly to prejudice the defendant in the eyes of the jury.'" Mercer, supra, 324 N.J.Super. at 299, 735 A.2d 576 (quoting Zwillman, supra, 112 N.J.Super. at 22, 270 A.2d 284). Even if "no single instance may have been sufficient to warrant a reversal," we must determine whether, in the aggregate, "the actions of the trial judge deprived the defendant of a fair trial." Mercer, supra, 324 N.J.Super. at 299, 735 A.2d 576. We have admonished trial judges to "never unfairly criticize or humiliate defense counsel or a defense witness." Zwillman, supra, 112 N.J.Super. at 21, 270 A.2d 284. Moreover, we will not find harmless error simply "because we may believe that the defendant was guilty as charged." Id. at 20, 270 A.2d 284.
Here, the trial judge appears to have overreacted to Chalmers' statement that plaintiff was a "thirty-seven-year-old Jamaican woman." It is common knowledge that certain diseases and conditions affect individuals of a particular race or ethnic background. Once the judge expressed his concern to counsel, however, defense counsel had the opportunity to diffuse the issue simply by requesting redirect examination and asking Chalmers whether the fact that plaintiff was a "Jamaican woman" had any impact on his diagnosis. Defense counsel chose not to so. When the trial judge questioned Chalmers, however, he softened the inquiry by initially asking which part of the spine Chalmers was referring to when he stated that there were long-standing degenerative changes. When the judge asked Chalmers whether plaintiff's Jamaican ancestry had any relevance to his findings, the doctor answered clearly and unequivocally, "None in this case," and went on to explain the reason for his inclusion of a person's ancestry in his diagnoses. Nevertheless, the judge persisted in asking two more questions as to whether plaintiff's ancestry had any relevance to the issues before the jury.
In our view, the judge's inquiry was over-reaching. The judge could have easily directed defense counsel simply to ask the witness whether plaintiff's Jamaican ancestry had any impact on the medical findings or was in any way relevant to the jury's determination. The judge did not do so, nor did defense counsel pick up on the judge's concerns and pursue the inquiry himself. In our review of the entire transcript, however, we find the judge's questioning of Chalmers to be harmless.
Trial judges clearly have a duty to assure that both parties obtain a fair trial. When either party is a member of a protected class, the judge must be particularly alert to ensure a fair trial. Judges must not be trigger-happy, however, and respond instantly to every racial or ethnic reference in a trial. The judge must take such references in the context of the situation and weigh them carefully before intervening, lest he or she gives the impression of siding with one party or the other. Weyerhaeuser, supra, 324 N.J.Super. at 298, 735 A.2d 576.
We have carefully considered the entire record in this matter, and we are satisfied that defendants were not prejudiced by the judge's sua sponte Batson/Gilmore inquiry, *1079 intervention in the cross-examination of defendants' expert.
Affirmed.
NOTES
[1] The first prong of the Batson test places the burden on the party who alleges discrimination to prove the existence of purposeful discrimination. Batson, supra, 476 U.S. at 93, 106 S.Ct. at 1721, 90 L.Ed.2d at 85.