997 A.2d 1079 (2010)
43 N.J. Super. 173
Barbara SZCZECINA and Michael Szczecina, Plaintiffs-Respondents,
v.
PV HOLDING CORP., Defendant, and
Joseph J. Martino, III, and Melissa Boos, Defendants-Appellants.
DOCKET NO. A-3437-08T3.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 2010.
Decided June 25, 2010.
*1080 William C. Carey, Morristown, argued the cause for appellants (McElroy, Deutsch, Mulvaney, and Carpenter, L.L.P., attorneys; Mr. Carey, on the brief).
Terry Paul Bottinelli, Hackensack, argued the cause for respondents (Herten, Burstein, Sheridan, Cevasco, Bottinelli, Litt, and Harz, L.L.C., attorneys; Thomas S. McGuire, on the brief).
Before Judges PAYNE, WAUGH, and FASCIALE.
The opinion of the court was delivered by
FASCIALE, J.S.C. (temporarily assigned).
Defendants Joseph J. Martino and Melissa Boos[1] appeal from a $1,000,000 jury verdict following a verbal threshold, damages-only trial. The primary question on appeal is whether clearly inappropriate statements about the defense made by plaintiff's counsel in his opening statement and summation warrant a new trial. Those statements included derisive comments about defendants, their counsel, and their expert witnesses, as well as counsel's request that the jury "send a message" through its verdict. Because we conclude that counsel's conduct infected the jury's verdict, we reverse and remand for a new trial.
On August 2, 2004, plaintiff Barbara Szczecina[2] and defendant Joseph J. Martino *1081 were the drivers of two cars involved in a three-car accident. She and her passenger son, David Johnson, filed separate lawsuits seeking damages for personal injuries sustained in the accident. At the non-binding arbitration involving plaintiff's claim, Martino was found one hundred percent responsible for the accident, and plaintiff was awarded $65,000. Martino filed a request for a trial de novo. After both remaining defendants stipulated to liability, the two cases were tried simultaneously on the issue of damages, including the verbal threshold. During deliberations, Johnson settled.
Plaintiff was fifty-six years old at the time of the accident. She alleged injuries to her left hand and neck, as well as injuries to her back for which she received numerous epidural injections. Defendants argued that her hand and neck complaints had resolved before trial, and that plaintiff's back pain was neither permanent nor related to the accident.
The primary contested issue at trial was whether there was a causal relationship between plaintiff's alleged back pain and the accident. In support of their position that it was not, defendants pointed to the fact that there was no documented complaint by plaintiff about back pain until many months after the accident. Plaintiff complained of back pain at a visit with her chiropractor on March 16, 2005, and first mentioned back pain to her orthopedist on September 2, 2005. Defendants also pointed to the facts that, on the night of the accident, no x-rays of plaintiff's back were taken in the hospital, and the hospital records do not mention back problems.
Defendants pointed to the testimony of plaintiff's pain management specialist, Dr. Lipsky, that there were arthritic changes in her back. Plaintiff first saw Dr. Lipsky on March 16, 2005, but he did not treat her between May 2005 and November 2006. In November 2006, plaintiff received three epidural injections. In January 2007, plaintiff experienced a different type of back pain. Dr. Lipsky testified that the later-occurring low back pain was "related more to the facet joints and the inflammatory changes around the epidural space and less to inflammation of the nerve root" and that plaintiff had "less referred pain to the leg."
Plaintiff contended that at the hospital she complained about back pain, and that someone "wrote something down," but she did not know "what they wrote down." Plaintiff testified that at her first visit with her orthopedist she told him about her back pain, but she speculated that he never wrote it down because she thought "he was more concerned with [her] hand and he was in the process of moving his offices."
On December 11, 2008, the jury returned a verdict of $1,000,000 in favor of plaintiff, unanimously finding that the accident proximately caused her injury.[3] On February 6, 2009, the trial judge denied defendants' motion for a new trial or, alternatively, for a remittitur. Defendants argued, among other things, that the verdict was against the weight of the evidence and was improperly affected by the comments made by plaintiff's counsel during opening and closing arguments. In denying the motion, the judge found that "[w]hile counsel may have made a few comments that should not be encouraged, there is no indication that these few comments prejudiced defendants to such an extent that they are entitled to a new trial."
*1082 On appeal, defendants contend that plaintiff's counsel overstepped the bounds of appropriate trial advocacy which, they contend, led to an unjust result. They also argue that plaintiff failed to prove a permanent injury as required by N.J.S.A. 39:6A-8a, that the damage award was excessive, that a remittitur was warranted, and that the trial judge erred by not amending the judgment to remove Boos as a liable defendant because she had no involvement in causing the accident and there was no agency. Finally, defendants contend that the trial court erred by not granting the motion for a new trial.
We begin our analysis by focusing on the statements made by plaintiff's counsel. In addition to being excessively argumentative, his opening statement attacked the integrity of defendants, defense counsel and the defense witnesses. Even more inappropriately, plaintiff's counsel asked the jury to "send a message" that "we're not going to accept that the paid agreers, the spin doctors[,] are trying to get [defendants] off the hook." His summation, which can appropriately contain argument to the jury, was inappropriate in this case because it continued additional inflammatory attacks on the defense.
"The fundamental purpose of opening statements is `"to do no more than inform the jury in a general way of the nature of the action and the basic factual hypothesis projected, so that they may be better prepared to understand the evidence."'" Amaru v. Stratton, 209 N.J.Super. 1, 15, 506 A.2d 1225 (App.Div. 1985) (quoting Passaic Valley Sewerage Comm'rs v. Geo. M. Brewster & Son, Inc., 32 N.J. 595, 605, 161 A.2d 503 (1960) (quoting Farkas v. Middlesex County Bd. of Chosen Freeholders, 49 N.J.Super. 363, 367-68, 139 A.2d 779 (App.Div.1958))). Counsel "must be summary and succinct" and "[n]othing must be said which the lawyer knows cannot in fact be proved or is legally inadmissible." Passaic Valley, supra, 32 N.J. at 605, 161 A.2d 503 (citing Paxton v. Misiuk, 54 N.J.Super. 15, 20, 148 A.2d 217 (App.Div.1959), aff'd, 34 N.J. 453, 170 A.2d 16 (1961); Shafer v. H.B. Thomas Co., 53 N.J.Super. 19, 26, 146 A.2d 483 (App.Div.1958)).
In addition, it is improper for an attorney to make derisive statements about parties, their counsel, or their witnesses. In Rodd v. Raritan Radiologic Associates, P.A., 373 N.J.Super. 154, 171-72, 860 A.2d 1003 (App.Div.2004), we said:
Although attorneys are given broad latitude in summation, they may not use disparaging language to discredit the opposing party, or witness, Henker v. Preybylowski, 216 N.J.Super. 513, 518-19, 524 A.2d 455 (App.Div.1987); Geler v. Akawie, 358 N.J.Super. 437, 470-71, 818 A.2d 455 (App.Div.), certif. denied, 177 N.J. 223, 827 A.2d 290 (2003), or accuse a party's attorney of wanting the jury to evaluate the evidence unfairly, of trying to deceive the jury, or of deliberately distorting the evidence.
Rodd was a medical malpractice case in which the plaintiff's counsel argued in summation "that [the] defendant missed the evidence of cancer because he cared more about `making money' and living `the good life'. . . ." Rodd, supra, 373 N.J.Super. at 171, 860 A.2d 1003. The plaintiff's counsel continued by "disparaging defendant's expert, who, he maintained, argued `a little bit more like a lawyer than a doctor' and was `a professional witness' who `adjust[ed] his testimony for every case.'" Ibid. "These comments remained uncorrected by the trial judge." Ibid.
The Rodd court found these comments were "unduly harsh and amounted to an attack on defendant's character and his witness's integrity." Ibid. "They occupy no rightful place in proper commentary on the evidence and the credibility of testimony. *1083 They are not to be repeated on retrial." Id. at 171-72, 860 A.2d 1003.
In Geler, supra, 358 N.J.Super. at 467, 818 A.2d 402, we said:
We have likewise held that "[a]n attack by counsel upon a litigant's character or morals, when they are not in issue, is a particularly reprehensible type of impropriety." Paxton v. Misiuk, 54 N.J.Super. 15, 22, 148 A.2d 217 (App.Div.1959), aff'd, 34 N.J. 453, 170 A.2d 16 (1961). Nor can parties and witnesses be made the target of invective and derogation. Henker, supra, 216 N.J.Super. at 518-19, 524 A.2d 455. Reasoned analysis of the evidence and the credibility of testimony is one thing; wholesale disparagement through an unrestricted deluge of epithets is another. Ibid. See also Tabor v. O'Grady, 59 N.J.Super. 330, 340-41, 157 A.2d 701 (App.Div.1960), mod. on other grounds, 61 N.J.Super. 446, 161 A.2d 267 (App. Div.1960). This is so, because of the tendency of such comments "to instill in the minds of the jury impressions not founded upon the evidence." Botta [v. Brunner], 26 N.J. [82,] 98, 138 A.2d 713 [(1958)].
In Geler, the plaintiff's counsel "filled his closing argument with derisive and derogatory comments regarding defendants, their counsel, their witnesses and their evidence in general." Geler, supra, 358 N.J.Super. at 468, 818 A.2d 402. The defendants' case was described as "designed `[t]o confuse, to muddle, put up smoke screens' . . . designed to throw the jury `off track.'" Ibid.
In Henker, supra, 216 N.J.Super. at 518, 524 A.2d 455, the "[p]laintiffs' attorney used defendant's attorney as a target of repeated invectives." He accused the defendant's attorney of "wanting the jury to evaluate the evidence unfairly, of trying to deceive the jury, of deliberately distorting the evidence, of playing `a game' . . . ." Ibid. In reversing the jury's verdict and remanding for a new trial we observed: "Perhaps none of these comments standing alone is out of bounds, but taken together they represent a deliberate effort by plaintiffs' attorney to have the jurors see themselves as destroyers of evil forces, personified by defendant and his attorney, that have been depriving his clients of justice." Ibid.
In Jackowitz v. Lang, 408 N.J.Super. 495, 508, 975 A.2d 531 (App.Div.2009), we considered the propriety of "send a message" arguments in a verbal threshold, damages-only trial. In that case, a jury awarded the plaintiff $50,000 in compensatory damages, a motion for a new trial was granted, and the new trial resulted in a verdict of no cause of action. Id. at 502-03, 975 A.2d 531. In affirming, we concluded "that the use of the `sending a message' argument is inappropriate in a civil case where the only issue is compensatory damages." Id. at 509, 975 A.2d 531. "The caselaw informs us that the use of a `send a message' argument is clearly inappropriate in criminal cases, may be inappropriate in punitive damage cases and is clearly inappropriate in civil compensatory damage cases." Id. at 508, 975 A.2d 531.
Here, it was inappropriate to ask the jury to "send a message" that "[w]e're not going to accept that the paid agreers, the spin doctors[,] are trying to get you off the hook." Plaintiff's counsel repeatedly overstepped the bounds of permissible comment. He said the defense "game plan" was to have a spokesman,[4] the defense lawyer, get "spin doctors" and pay them to blame plaintiff and "muddy up the waters." *1084 Counsel referred to "spin doctors" thirty-eight times, said "paid agreers" on four occasions, called defense counsel "spokesman" thirteen times, used the term "game plan" on seven occasions, referred to the medical defense witnesses as a "tag team" and "hired guns," and accused them of intentionally muddying up the waters.
To put the impropriety of counsel's conduct in context, we quote at length from his opening and closing statements. Counsel made the following remarks during his opening statement:
You know, years ago there was a television show, there was a guy there, Flip Wilson. . . . And what was Flip Wilson's famous line? "The devil made me do it."
Well, since that started on television, think about what's happened in society. We've got now people who don't want to accept responsibility for what they've done.
. . . .
Plaxico Burris . . . goes into [a] nightclub. He's got a gun with him . . . he shoots his leg. . . .
He's not licensed to carry a firearm. He broke the rules. He's not supposed to carry a firearm in New York. He broke the rules. . . .
But what's the first thing that happens?.. . He's got to get himself a spokesman.
. . . .
Responsibility, is he accepting responsibility? The devil made me do it. What's he do? He gets a spokesman, the American way.
. . . .
So what we have [here], we have Mr. Martino, what's he do? He gets himself a spokesman . . . . [H]e's got [d]efense counsel. . . . He's a spokesman.
. . . .
[P]eople in Hollywood, oh, my God a spokesman for Britney Spears, a spokesman for Paris Hilton. Everybody has got spokesmen.
So in this lawsuit we have [a] spokesman. You've got to figure out how we are going to deal with this. Well, what are we dealing with? Mr. Martino broke the rules.
. . . .
He's not turning around and saying I caused the collision, these people got hurt, I'm sorry.
. . . .
So we've got to figure out a way for Mr. Martinolet's deflect this.
. . . .
What do we do about this? Well, you know, spokesmen go out and the spokesmen turn around andnew phrase. What do they do? They get spin doctors... . They turn around and they've got to go to the spin room. . . . And they've got to spin it the way it makes it look best for them.
. . . .
So okay, what does Mr. Martino need? He needs spin doctors. And literally they go out and they get spin doctors. They've got some folks that are going to come and they're going to try tell you to spin this
. . . .
So how do we spin this says Mr. Martino. Let's spin it, so that we have our spokesman get some spin doctors who get some doctors to come in and try to explain this away. This can be our game plan. This could work for us.
So let's see. We've got Dr. Goldstone.
. . . .
[H]e has himself down as a consultant.
. . . .
So the first conductor in the game plan is well let's get Dr. Goldstone. . . . He's only a[d]efense spin doctor.

*1085 . . . .
[During a particular period, plaintiff is] getting what's called the conservative treatment. So the spin doctors, how do we play with this? Ah-hah. I know what we can do. . . . Let's muddy up the waters a bit.
. . . .
So now we start, and we've got the water clouding up, and we've got the spin doctor working on it, so we got hmm, let's make it so it's not clear. Let's do that.
. . . .
So we have Goldstone. What's the spin? Ah, let's shift the blame. . . . So we got him [Goldstone] trying to muddy the water.
. . . .
So we're down to the situation where you've got the spin doctor with [his] game plan. You've got the spin doctor Goldstone, okay, so you know what we need? We need to get another doctor here. And they go through their list and they find Dr. Willner. Dr. Willner is listed as Bergen Neurology Consultants. You know what consultants are, right? Paid agreers.
. . . .
So he's going to get in here and he says well, you know, she could bend 90 degrees.
But the spin doctor has to turn around and make that into something nefarious, something wrong, something that she's a malingerer or something. So he's going to come in and he's going to turn around. And they come up with a plan with him, the neurologist, the nerve doctor. How do we spin this, okay?
. . . .
So let's spin it. Spin it some more. Oh, my gosh. Look at this. We've got it spun around.
. . . .
What's the spin doctor going to say about somebody who complains? Think about it. Whatif you were there and you're the spin doctor you're going to turn around and say hmm, she exaggerates. She's exaggerating the significance and permanency of her injuries that she's had to her lower back. Again it's getting darker and darker. . . .
. . . .
Do you get the picture now? The spin doctors turn around and say yeah, I caused the accident, but I didn't cause these injuries.
. . . .
So our spin doctors . . . all they're trying to do is muddy up the water... .
. . . .
So what do we do? You know, we better get another spin doctor. The next spin doctor is . . . Dr. Noble . . . .
. . . .
He's paidI'm sorry. He's retained to come and spin this [reading the films].
. . . .
The [d]efense has gotten a spokesman and the [d]efense spokesman goes and gets spin doctors. And now they have taken something that should be crystal clear and they're spinning it to create doubt in your mind. They're spinning it . . . .
. . . .
So what do we have? We've got the spin doctors coming in.
. . . .
We know who caused the accident because they already admitted it. . . .
But you know what? He doesn't want to accept the responsibility . . . . They've gone too far. They've got their spokesman to get their spin doctors. The bottom line is Mr. Martino broke the rules. He doesn't want to accept the responsibility. . . . He has his lawyers *1086 figure out how to try to get him out of the responsibility. They get the spin doctors in here. And Mr. Martino broke the rules. He's found a bunch of agreers to put the blame on [plaintiff].
. . . .
[W]e're going to ask you to send a message to him that says, [plaintiff], we agree that people are responsible for what they do, that people have to bear responsibility for their actions. We're not going to accept the devil made me do it. We're not going to accept that the paid agreers, the spin doctors are trying to get you off the hook. We're going to ask you to send a message and send that message loud and clear.
In addition, plaintiff's counsel said the following in summation:
[I]f you remember, awhile ago we had told you what was going to happen, what they were going to do and that they were going to try to cloud the issues. . . . I told you it was coming. . . . Mr. Martino decided that he was going to defend this case in the manner that was chosen by . . . getting a spokesman or a handler... . And the folks over at [defense counsel's] office . . . they come in and they say, "Hmm, we're going to get ourselves a known quantity." . . . Noble and Willner. . . . [T]hey're a tag team. . . . [T]hey can spin everything.. . .
. . . .
[W]ho called them? [Defense counsel's] office. . . . It's not like Martino ever came in and said, "I'm sorry." Instead of saying, "I'm sorry" . . . they decide that they're going to put on a defense.
. . . .
[T]hey certainly have had a game plan. And integral to their game plan was to get these agree-ers on their side. . . . [T]hey're playing a game with this. And this is part of their game plan to get you confused, to obfuscate, to darken.
. . . .
[After a discussion of the jury verdict form:] If you answer no to that question [proximate cause] then that's a great victory for the defense. Because that is going out as, "You know what, keep on coming in, keep on having the doctors come in and say exaggeration. Keep on having folks come in here and say that this is degenerative."
. . . .
[B]e careful when you're going through your deliberations that you don't turn into the types of agree-ers who have the callousness to obfuscate what the truth is . . . .
We note that at trial defense counsel made no objections to the portions of the opening statement and summation about which defendants now complain on appeal. Where defense counsel has not objected, we generally will not reverse unless plain error is shown. Rule 2:10-2 reads in full:
Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.
The possibility of an unjust result must be sufficient "to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).
Despite the failure to object, we cannot simply overlook the conduct of plaintiff's counsel, who unwarrantedly and inappropriately accused the entire defense of spinning the evidence. The conduct was "clearly capable of producing an unjust result."
Our careful review of the record leads us to the conclusion that the egregious nature *1087 of counsel's conduct, occurring in a case in which there was a real question as to whether plaintiff's back injuries were caused by the accident and in which treatment was relatively conservative, raises, at the very least, a reasonable doubt as to whether the jury's million-dollar verdict resulted from the misconduct rather than from the merits of the case.[5] Although we base our decision on the overall misconduct, counsel's invitation to the jury to "send a message" is particularly troubling. While we are cognizant of the fact that the trial judge gave the usual cautionary instructions to the jury about the arguments of counsel, we are firmly of the view that the pervasive nature of the misconduct here was not cured by those admonitions.
Under the circumstances of this case, we conclude that the trial judge had an affirmative duty to intervene on his own initiative. It is the responsibility of the judge to ensure that a fair trial is received by the parties, notwithstanding that counsel fails to object. Hitchman v. Nagy, 382 N.J.Super. 433, 453, 889 A.2d 1066 (App. Div.), certif. denied, 186 N.J. 600, 897 A.2d 1056 (2006). As we said in Hitchman, "[o]ur courts have long rejected the arbitrary and artificial methods of the pure adversary system of litigation which regards the lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed." Id. at 451, 889 A.2d 1066 (internal quotations omitted). We should not be understood to imply that a trial judge should interfere generally with trial tactics employed by counsel when there is no objection. We appreciate the importance of letting the attorneys "try their own cases." However, when counsel engages in patently inappropriate conduct, such as derisive statements and other invectives aimed at opposing parties, counsel or witnesses, or when there is an inappropriate request to "send a message,"[6] the trial judge should act before the situation reaches the point at which an unjust result is likely or even possible. Attorneys who engage in this type of conduct risk losing a favorable jury verdict, even if there is no objection.
Because we reverse and remand for a new trial on the basis of the inappropriate arguments made by plaintiff's counsel, we do not reach the other arguments made by defendants on appeal.[7]
Reversed and remanded for a new trial.
NOTES
[1] Defendant PV Holding Corp. was dismissed prior to trial and is not involved in this appeal.
[2] Plaintiff Michael Szczecina only filed a per quod claim. We will refer to plaintiff Barbara Szczecina as "plaintiff" throughout this opinion. The record does not reflect whether a verdict was returned on the per quod claim of Michael Szczecina.
[3] The jury was not told that David Johnson settled during deliberations, and returned a verdict of no cause of action finding that his injury was not permanent.
[4] Although we acknowledge that the trial judge referred to the attorneys as "spokespersons" for their clients during his jury instructions, we utterly reject counsel's suggestion that the judge's use of the term justified his misuse of it.
[5] Because there are indications in the record that defense counsel, who otherwise objected relatively frequently, may have decided not to object as a matter of trial tactics, we caution trial counsel that our decision in this case is premised on the particularly outrageous nature of the conduct at issue combined with what we view as a disproportionate verdict in a case in which causation was genuinely at issue and treatment was limited. See Jackowitz, supra, 408 N.J.Super. at 505, 975 A.2d 531 ("Fleeting comments, even if improper, may not warrant a new trial, particularly when the verdict is fair.").
[6] We are cognizant of the case law that may allow counsel to ask the jury to "send a message" in the very narrow area of punitive damages. Jackowitz, supra, 408 N.J.Super. at 506, 975 A.2d 531.
[7] Boos sought to amend the judgment to remove her name because there was no agency relationship with Martino. Boos asserted that she was the named insured on the automobile policy, but was not involved in the rental or operation of the car driven by Martino. Boos argued that her liability was "neither litigated [nor] argued," and that her name was mistakenly listed on the verdict sheet. The issue of agency is best presented on remand before the new trial.