**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2169-14T1

MINDY KLARMAN,

     Plaintiff-Respondent,

v.

PATHMARK SUPERMARKET and
PATHMARK OF LAKE HOPATCONG,

     Defendants-Appellants.

_____

> Argued November 7, 2018 – Decided December 24, 2018
>
> Before Judges Yannotti, Gilson and Natali.
>
> On appeal from Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1284-11.
>
> Edward J. De Pascale argued the cause for appellants (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; William C. Carey, on the briefs).
>
> Craig M. Rothenberg argued the cause for respondent (Rothenberg, Rubenstein, Berliner & Shinrod, LLC, attorneys; Elizabeth H. Hamlin, on the brief).

PER CURIAM

Defendants Pathmark Supermarket and Pathmark of Lake Hopatcong appeal from an order entered in this matter on December 4, 2014, which denied defendants' motion for a new trial or remittitur, and entered judgment for plaintiff in the amount of $1,530,000, plus prejudgment interest, and attorney's fees and costs pursuant to Rule 4:58-2(a), the offer of judgment rule. We affirm.

I.

In May 2011, plaintiff filed a complaint alleging that on January 31, 2011, she was in defendants' supermarket in Lake Hopatcong and fell. Plaintiff alleged defendants allowed a dangerous and hazardous condition to exist on the property, which caused her to fall. Plaintiff claims she sustained severe, personal injuries for which she sought damages, interest, and the costs of suit. Thereafter, the parties engaged in discovery and the parties exchanged offers of judgment pursuant to Rule 4:58-1. Plaintiff rejected defendants' offer, and in September and October 2014, the matter was tried before a jury.

At trial, plaintiff testified that on January 31, 2011, she went with her son to defendants' supermarket to purchase some items that she needed. Plaintiff's son remained in the car while plaintiff entered the store. It was a sunny day, but it had snowed before that day, and there were piles of snow in the parking lot. Plaintiff did not take a shopping cart, but she noted that they were stored outside

the store and throughout the parking lot. Plaintiff did not recall whether there was a mat on the floor in the vestibule or the entrance to the store.

Plaintiff went to the produce aisle and "grabbed" several items. She proceeded to the meat department, where she picked up some chicken. Plaintiff then went to the check out to pay for her items. She slipped and landed on her left knee. Plaintiff said that she tried to break her fall with her left arm. She was carrying a shopping basket in her right hand. She said the basket "went flying with [her] groceries."

Plaintiff stated that she was on the floor and several individuals came to her aid. A police officer asked her where she slipped, and she replied, "right there." She observed "a puddle of water or a liquid" at that location. Plaintiff estimated the puddle was about twelve inches in diameter.

Plaintiff stated that she injured her left shoulder and left knee. She felt "excruciating" pain in her knee. She also said she hurt her neck and back. Emergency medical personnel arrived, placed her on a stretcher, and transported her by ambulance to a hospital.

At the hospital, plaintiff learned she had fractured her shoulder and knee, and required surgery. The surgery was performed and five days later, plaintiff was discharged from the hospital. She returned to the hospital two weeks later

A-2169-14T1

to have surgical staples removed from her knee. Thereafter, plaintiff engaged in multiple rounds of physical therapy for the injuries to her shoulder and knee.

Plaintiff further testified that her knee remained "swollen and hot for a couple of years after that injury." She estimated that she last received medical treatment for her injuries in 2013. Plaintiff stated that at the time of her final visit, her shoulder had a good range of motion and her ability to bear weight had improved from the time of the injury. She stated her knee also had a good range of motion, but weight bearing was still painful. Prior to the final visit, plaintiff's physician diagnosed her with arthritis underneath the kneecap, and administered gel injections to help alleviate the pain.

At the time of the accident, Reginald Slavin was the assistant store manager for the supermarket. He was deposed, and at trial, the parties agreed that Slavin's deposition testimony would be read into the record. Slavin testified that at the time of plaintiff's accident, he was responsible for the entire store. There were about thirty-five persons working in the store that day, and one of those individuals was a porter, who had responsibility to clean and maintain the premises.

Slavin said that after plaintiff fell, he was the first person on the scene, and he observed water on the floor. He stated that the water had come from

4

snow "that shook off the bottom of carriages because there was snowfall and it was on the bottom of the carriages." He was asked if he understood that customers had entered the store, bringing shopping carts from outside the store, which had snow on them. Slavin replied, "Yes."

Slavin agreed that the snow on the shopping carts would melt and the water would drip on the floor. Previously, Slavin determined the most efficient way to deal with the water problem was to place mats on the floor. The mats would collect most of the water that had fallen from the carts. Slavin believed this is how the water got onto the floor on the day plaintiff was injured.

Slavin further testified that the supermarket did not have a protocol which required an employee to go through the market on a regular basis to ensure there was no water on the floor from the shopping carts. He said the porter did not have responsibility for cleaning the snow, ice, or wetness from the shopping carts before customers or employees brought them into the store. He also stated the supermarket did not have a protocol to ensure that snow or ice did not accumulate on the shopping carts.

Plaintiff also presented testimony from Steven Nehmer, M.D., an orthopedic surgeon. Nehmer explained that based on his examination of plaintiff's injuries and a review of her medical records, he believed plaintiff's

fall on January 31, 2011, caused the injuries to her left shoulder and left knee. Nehmer stated that arthritis was present beneath plaintiff's kneecap, which was related to the fall and subsequent fracture. He explained that arthritis is a progressive condition, which causes increased pain when an individual engages in physical activity. Nehmer further testified that he did not expect plaintiff to recover fully from her injuries. He stated that plaintiff will "always have some symptoms, in her shoulder probably more intermittently, but certainly in her knee she will have pain, and chances are with time it will grow wors[e]."

After the evidence had been presented, the judge conducted a charge conference. Over defendants' objection, the judge ruled that he would instruct the jury on the mode-of-operation rule and instruct the jury that plaintiff would not have to prove defendants had actual or constructive notice of the alleged dangerous condition.

Defendants then moved for involuntary dismissal of the complaint pursuant to Rule 4:37-1(a), and plaintiff filed a motion for a directed verdict on the issue of liability. The judge reserved decisions on the motions. Counsel then presented their closing arguments, and the judge instructed the jurors on the principles that they should apply in reaching their decision.

The jury returned a verdict in plaintiff's favor and awarded her $1,500,000 for pain, suffering, disability, and the loss of the enjoyment of life, along with $30,000 for lost income. Thereafter, defendants filed a motion for a new trial or remittitur. After hearing oral arguments, the judge denied the motion. The judge entered an order dated December 4, 2014, which denied the motion and entered judgment for plaintiff. This appeal followed.

II.

Defendants first argue that the trial judge erred by charging the jury in accordance with the mode-of-operation rule. Defendants contend the jury's decision should have been governed by general negligence principles pertaining to injuries sustained by business invitees due to a dangerous condition of the business's property. We disagree.

In New Jersey, a business owner owes invitees "a duty of reasonable or due care to provide a safe environment for doing that which is within the scope of the invitation." Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563 (2003). A business owner has an affirmative duty to inspect the premises, discover or eliminate dangerous conditions, and maintain the premises in a safe condition. Ibid.

7

Generally, a business owner is not liable for injuries caused by a dangerous condition on its property unless the owner had actual or constructive notice of the condition. Ibid. The plaintiff may show the defendant had constructive notice of the condition if it existed for a sufficient length so that a reasonably diligent person would have known of the condition. Parmenter v. Jarvis Drug Store, Inc., 48 N.J. Super. 507, 510 (App. Div. 1957).

The mode-of-operation rule is a "special application of foreseeability principles" created to address the risks posed by certain businesses whose operations involve customer self-service. Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 262 (2015) (citing Nisivoccia, 175 N.J. at 563-66; Wollerman v. Grand Union Stores, Inc., 47 N.J. 426, 429-30 (1966); Bozza v. Vornado, Inc., 42 N.J. 355, 358-60 (1964)). Under the mode-of-operation rule, business invitees who are injured while engaged in customer self-service are "entitled to an inference of negligence" and need not "prove that the business owner had actual or constructive notice of the dangerous condition that caused the accident." Id. at 248.

To apply the mode-of-operation rule, the court considers the following. First, the plaintiff must show that he or she sustained an injury in a self-service setting, where customers independently handle merchandise or "come into direct

contact with product displays, shelving, packaging, and other aspects of the facility that may present a risk" to the invitee.  Id. at 262.  Second, the accident occurred in an area "affected by the business's self-service operations, [however, the area] may extend beyond the produce aisle of supermarkets and other facilities traditionally associated with self-service activities."  Ibid.  Third, the rule is not limited to situations in which a customer's negligence creates a dangerous condition.  Id. at 263.

When the mode-of-operation rule applies, the plaintiff is entitled to an inference of negligence, which shifts the burden of production to the defendant.  Ibid.  The defendant may avoid liability if it presents evidence showing it did all that a reasonable prudent person would have done in light of the risk of injury the mode of operation entails.  Ibid.

Here, the trial judge correctly ruled that the mode-of-operation rule applied.  It is undisputed that defendants' supermarket is a self-service operation, and plaintiff was injured in an area affected by the market's self-service operation.  Plaintiff testified she slipped and fell due to a puddle of water on the floor of the store, near the check-out section.  Slavin testified unequivocally that customers brought shopping carts into the store, and the carts were laden with

9

snow, which had fallen earlier. Once inside, the snow melted and collected on the floor.

Slavin testified that mats were placed on the floor to address the situation. He also stated that the store did not have a regular protocol for inspecting the premises to ensure there was no accumulation of water from snow brought into the store on shopping carts. Furthermore, the store's porter was not required to address such conditions on a regular basis. We are convinced the evidence met the requirements for application of the mode-of-operation rule.

On appeal, defendants argue that the mode-of-operation rule did not apply in this case because the rule generally has been confined to dangerous conditions arising from the handling of merchandise or the placement of products. Defendants note that plaintiff was not injured due to the handling of any merchandise or the placement of any product.

However, in Prioleau, the Court noted that the mode-of-operation rule can be applied to a self-service business, when the customer sustains an injury due to the manner in which the customer or an employee handles merchandise or equipment. Ibid. Here, it is undisputed that the shopping carts were the store's equipment, and they were an essential aspect of defendants' self-service business model.

Moreover, as Slavin explained, it was the supermarket's mode of operation to allow the shopping carts to remain outside the store, unprotected from the accumulation of snow. The store allowed customers to bring carts laden with snow inside, and it did not have a policy for removal of any accumulated snow from the carts before customers brought them inside.

Defendants further argue that the trial judge should not have charged the jury on the mode-of-operation because the facts here are similar to the facts in Prioleau. In that case, the plaintiff asserted, among other things, that the defendant had allowed a dangerous condition to exist in its restaurant, which was allegedly created when patrons tracked water into the building on a rainy evening. Id. at 265.

The Prioleau Court held that the mode-of-operation rule would not apply to such a claim. The Court stated, "The potential for customers to track water into a building during inclement weather is not contingent on a defendant's business model; that risk exists in virtually any facility that admits patrons from public sidewalks or parking areas into its facility." Ibid. In this case, however, the potential for customers to track snow into the building was contingent upon defendant's business model, which involves the use of shopping carts in the market's self-service operation.

A-2169-14T1

# III.

Next, defendants argue that the jury's award of damages for pain and suffering, disability, impairment, and the loss of the enjoyment of life, should be set aside on several grounds. Defendants contend plaintiff's attorney made improper comments in summation. They also contend the award is grossly excessive.

Defendants argue that in his closing argument, plaintiff's attorney made an improper argument regarding the award of damages. Counsel stated that "[plaintiff is] going to live about 300,000 hours with [her] injury, millions of minutes with this injury." He also stated that

> [Y]ou can do the math - - 60 minutes times per hour, whatever it is - - it's millions and millions of minutes. And I want you to think about that. Not that there's a magic to it, because there isn't. But when you're thinking about how to possibly compensate her not just for the three-and-a-half years she's been suffering up until now, but for the 28.5 years or so - - more less, whatever you decide, going forward.

Defendants did not object to counsel's remarks when they were made. They first raised this issue when they moved for a new trial.

On appeal, defendants argue that plaintiff's counsel made an improper argument based on the "Golden Rule." That rule is based on the principle that "you should do unto others as you would wish them to do unto you[.]" Geler v.

Akawie, 358 N.J. Super. 437, 464 (App. Div. 2003).  Here, plaintiff's counsel did not invoke the rule.  Counsel did not ask the jurors to place themselves in plaintiff's position or otherwise suggest that the jurors should decide the case based on their personal interests or biases.

Defendants further argue that the evidence presented at trial did not support counsel's assertion that plaintiff would experience pain and suffering for "millions" of minutes.  Defendants contend the evidence showed that plaintiff's shoulder injury had essentially resolved, and her knee injury "had progressed well."  Again, we disagree.

At trial, plaintiff testified that she experiences pain from her injuries when she engages in certain routine activities.  Plaintiff stated that since the accident, she has had pain at some point every day.  Moreover, Nehmer, plaintiff's medical expert, testified that plaintiff developed arthritis due to her knee injury, and the arthritis is permanent.  Nehmer stated that plaintiff's pain will likely increase over time.

In addition, at the charge conference, the parties agreed the plaintiff's life expectancy is 28.5 years.  Thus, the assertion by plaintiff's attorney that plaintiff will suffer pain for "millions" of minutes has sufficient support in the evidence. The comment was not improper.

A-2169-14T1

Defendants also contend that plaintiff's counsel's assertions were not a proper time-unit argument under Rule 1:7-1(b). The rule provides that "[i]n civil cases any party may suggest to the trier of fact, with respect to any element of damages, that unliquidated damages be calculated on a time-unit basis without reference to a specific sum." Ibid. As noted, plaintiff's counsel stated that the jury could calculate damages by reference to units of time; however, counsel did not refer to a specific sum. Therefore, the comments were not improper.

In addition, defendants contend the jury's award is grossly excessive. Defendants argue that the trial judge should have set aside the award for pain and suffering, disability, impairment, and the loss of the enjoyment of life, and should have ordered a new trial on damages. Alternatively, defendants contend the trial judge should have ordered a remittitur.

"A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)). To overcome this presumption, a defendant need establish "clearly and convincingly," that the damages award is "a miscarriage of justice." Ibid. (quoting Baxter, 74 N.J. at 596).

14

"In deciding whether to grant a new trial or remittitur based on a purportedly excessive damages award, the court must give 'due regard to the opportunity of the jury to pass upon the credibility of the witnesses.'" Ibid. (quoting Ming Yu He v. Miller, 207 N.J. 230, 248 (2011)). Therefore, a "judge may not substitute his [or her] judgment for that of the jury merely because he [or she] would have reached the opposite conclusion; he [or she] is not a . . . decisive juror." Ibid. (quoting Baxter, 74 N.J. at 598).

In this case, the trial judge determined that defendants did not meet the standard for a new trial or remittitur. In ruling on defendants' motion, the judge observed that the accident was "very serious." The judge noted that plaintiff testified that when she fell, she experienced excruciating pain. Plaintiff fractured her kneecap, suffered a break in her shoulder, and required surgery. The judge observed that plaintiff's shoulder injury has essentially resolved. The judge added, however, that plaintiff continued to experience difficulties resulting from the injury to her knee.

The judge pointed out that plaintiff testified that she continued to experience pain, and it affected her ability to sleep and walk. The judge stated that at the time of trial, plaintiff was fifty-two years of age, and she had a life expectancy of about twenty-nine years. The testimony indicated she will

15

experience pain every single day of her life while awake, and the pain will worsen over time, thereby interfering with her ability to walk and to sleep. The judge found that the verdict was "very generous" but it did not shock the judicial conscience.

We are convinced the judge's findings are supported by the evidence presented at trial. The record supports the judge's determination that defendants did not meet the standard for a new trial, and there was no basis for setting aside the jury's award or for a remittitur.

## IV.

Defendants raise several other arguments with regard to the summation by plaintiff's attorney. Defendants contend plaintiff's counsel made improper, disparaging comments about defendants' attorney and his summation. Defendants first raised this argument on the motion for a new trial.

"[I]t is improper for an attorney to make derisive statements about parties, their counsel, or their witnesses." Szczecina v. PV Holding Corp., 414 N.J. Super. 173, 178 (App. Div. 2010). In addition, an attorney "may not use disparaging language to discredit the opposing party, or witness, or accuse a party's attorney of wanting the jury to evaluate the evidence unfairly, of trying to deceive the jury, or of deliberately distorting the evidence." Ibid. (quoting

Rodd v. Raritan Radiologic Assocs., P.A., 373 N.J. Super. 154, 171-72 (App. Div. 2004)).

On appeal, defendants contend plaintiff's counsel improperly stated that defendants' attorney was "trying to sully up what [the] case" was about by referring to "herniated disks" and plaintiff's prior ice skating accident. Plaintiff's counsel stated this was "extraneous nonsense." At another point, plaintiff's attorney asserted that the case was "getting muddied . . . [and] dirtied up." Counsel stated that defendants did not want to talk about plaintiff's injuries or its negligence because they could not "win."

We are convinced the comments were not improper and did not deny defendants of their right to a fair trial. The comments were primarily addressed to the substance of the closing argument of defendants' attorney. They were not an attempt to disparage defendants' attorney or have the jury unfairly evaluate the evidence. Significantly, defendant's attorney did not object to the comments when they were made. We can therefore assume defendants' counsel did not believe the comments were unduly prejudicial. State v. Timmendequas, 161 N.J. 515, 576 (1999).

Defendants further argue that plaintiff's counsel improperly commented on "subsequent remedial repair" of the alleged dangerous condition. The

contention lacks sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We note, however, that Slavin testified that after plaintiff fell, he wiped the floor to ensure that no one else fell. Defendants did not object to the introduction of this evidence. Thus, the comment by plaintiff's counsel was proper because it was based on evidence admitted at trial.

Furthermore, in denying the motion for a new trial, the trial judge found that Slavin's testimony was not evidence of a subsequent remedial measure under N.J.R.E. 407. Slavin's testimony was essentially a description of the condition of the premises at the time plaintiff fell. It was not introduced as evidence of a remedial measure, "taken after an event," and it was not presented to "prove that the event was caused by negligence or culpable conduct." Ibid.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2169-14T1