**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4449-16T3

MERCEDES G. DIAZ and
LIBERTO DIAZ, her husband,

      Plaintiffs-Appellants,

v.

GERALD GORMLEY, PERFORMANCE
FOOD GROUP and/or PERFORMANCE
FOOD SERVICE,

      Defendants-Respondents,

and

RYDER TRUCK RENTAL,

      Defendant.

      Submitted October 17, 2018 – Decided January 30, 2019

      Before Judges Alvarez and Reisner.

      On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0433-15.

McHugh & Imbornone, PA, attorneys for appellants (John F.X. Kennedy and Salvatore Imbornone, Jr., on the brief).

Lester Schwab Katz & Dwyer, LLP, attorneys for respondents (C. Briggs Johnson and Gerald Gunning, on the brief).

PER CURIAM

After a trial solely on the issue of damages, a jury awarded plaintiff Mercedes G. Diaz $3200 for pain and suffering, and $2800 for lost wages. The Law Division judge molded the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1000 to 1461 (ERISA) lien of $17,588.15 to the verdict. Subsequent to plaintiff's unsuccessful motion for a new trial, the judge sua sponte conducted oral argument on one of plaintiff's disputed medical bills, which she had not allowed plaintiff to present to the jury. Even at that point, plaintiff's counsel could not represent to the court that the bills had been timely and fully disclosed to defendants Gerald Gormley, Ryder Truck Rental, and Performance Food Group. The judge ordered plaintiff's counsel to provide a written accounting so the issue of reimbursement could be revisited at a second jury trial. Ultimately, the parties settled instead of trying the matter. We now affirm the judge's denial of the new trial motion and affirm the jury's verdict.

On appeal, plaintiff raises the following points:

POINT I

THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL AS DEFENSE COUNSEL'S UNDULY PREJUDICIAL COMMENTS WERE IMPROPER AND UNMISTAKABLY POISONED THE JURY VERDICT, RESULTING IN A MISCARRIAGE OF JUSTICE

POINT II

THE TRIAL COURT HAD AN AFFIRMATIVE DUTY TO INTERVENE DURING SUMMATION AND THE TRIAL COURT'S FAILURE TO DECLARE A MISTRIAL OR GRANT A NEW TRIAL WAS PLAIN ERROR

POINT III

THE CUMULATIVE ERROR DOCTRINE MANDATES THAT PLAINTIFF RECEIVE A NEW TRIAL

POINT IV

THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF PLAINTIFF'S VALID ERISA LIEN AND DR. LANE'S UNPAID MEDICAL BILL INCURRED AS A RESULT OF DEFENDANT'S ADMITTED NEGLIGENCE

We address the first three claims of error in combination and set forth the relevant circumstances and quotes in that section. We next address the issue of the exclusion of certain medical bills, plaintiff's point four, and provide the relevant facts in that portion of the opinion gleaned from the transcripts of proceedings.

3

I.

Plaintiff's new trial motion focused on defendant's allegedly prejudicial opening and closing statements and the judge's exclusion of a $40,000 bill for shoulder surgery and the ERISA lien from the proofs presented to the jury. The Law Division judge ruled that the opening and closing statements were not improper, and therefore not a basis for a new trial, as the "case boiled down very simply to the lack of credibility in the claims that were being asserted by plaintiff." She reviewed some of the testimony in support of her conclusion, noting that plaintiff had significant pre-existing health issues: "complaints of pain in the same body parts that she alleges were injured as a result of the accident." These included plaintiff's pre-existing urinary incontinence, which she alleged was worsened by her accident-related injuries. The judge observed that plaintiff presented "not one shred of paperwork" in support of her lost wages claim, and that defendants' video surveillance depicted plaintiff as "functioning completely normal." Hence the judge considered the jury's verdict reasonable. Because in her view the verdict was not "shockingly inadequate or [a] miscarriage of justice under the law[,]" she did not grant a new trial.

Plaintiff did not object to counsel's opening or closing. Before summations, plaintiff's attorney said he wished to raise a concern regarding the

anticipated defense arguments about plaintiff going to "litigation doctors." He said he was not requesting a ruling and never objected afterwards.

Rule 2:10-2 states that on appeal, we will not reverse unless the allegedly plain error was "clearly capable of producing an unjust result." It is presumed that when counsel fails to object, it ordinarily indicates counsel's perception that no harm has been inflicted. See Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 495 (2001). The absence of an objection suggests that counsel sees no prejudice and has the unfortunate consequence of preventing the trial judge from remedying any possible confusion. Bradford v. Kupper Assocs., 283 N.J. Super. 556, 573-74 (App. Div. 1995). Relief under this rule, at least in civil cases, is discretionary and "should be sparingly employed." Gaido v. Weiser, 115 N.J. 310, 311 (1989) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)). We examine the unobjected-to opening and closing statements under the plain error doctrine.

During opening statements, counsel is neither permitted to be excessively argumentative, or to attack the integrity of adverse parties. Szczecina v. P.V. Holding Corp., 414 N.J. Super. 173, 177-78 (App. Div. 2010). Summations must not continue inflammatory attacks on the other side. Id. at 178. As we said in Szczecina, "[t]he fundamental purpose of opening statements is 'to do no

more than inform the jury in a general way of the nature of the action and the basic factual hypothesis projected, so that they may be better prepared to understand the evidence.'" Ibid. (citing Amaru v. Stratton, 209 N.J. Super. 1, 15 (App. Div. 1985)).  In addition to being required to be "summary and succinct," an attorney must not state facts which cannot be proven, or make legally inadmissible statements.  Ibid. (citing Passaic Valley Sewerage Comm'rs v. George M. Brewster & Son, Inc., 32 N.J. 595, 605 (1960)).  It is inappropriate for an attorney to make "derisive statements" about the parties, their attorneys, or their witnesses.  Ibid.

Similarly, in summation counsel is prohibited from using disparaging language to discredit the opposing party.  Ibid.  Attacks upon a defendant's character or his witness's integrity "occupy no rightful place in proper commentary on the evidence and the credibility of testimony."  Rodd v. Raritan Radiologic Assocs., P.A., 373 N.J. Super. 154, 171-72 (App. Div. 2004).  The "send a message" argument is inappropriate in civil cases, not just criminal. Jackowitz v. Lang, 408 N.J. Super. 495, 508 (App. Div. 2009).  As a result, even when "silence is inexplicable[,]" the absence of an objection is not necessarily dispositive of a claim of plain error.  T.L. v. Goldberg, 453 N.J. Super. 539, 558-59 (App. Div. 2018).

6

We quote the relevant sections from defense counsel's opening and closing statements.  In opening, counsel said:

> Now, unfortunately, at that point, we have a divergence.  And I want to point out, yes, there was an accident, but an accident is not an opportunity for financial gain.
>
> . . . .
>
> But as counsel noted to you, it's a week later that she goes to her general practitioner and sees the nurse practitioner, or the physician's assistant, and there's no mention of this accident. . . . but I would submit to you, if you had had an accident which you're now claiming as they sit here now and by bringing this case they're claiming she suffered terrible injuries which have totally impacted her life a week after, you would have told your doctor something about it.
>
> Instead, she then starts going to a doctor on Staten Island.  And I think that's something also significant.  Why is she going to Staten Island?  She lives in Carteret.  She works in Carteret.  Are there no doctors here in New Jersey to treat her?  Instead, she's going over that bridge at 15 bucks a pop to see doctors.  And she sees the first doctor in Staten Island on July 2nd.  He immediately is ordering scans, tests, different things.  And I think when you see all of the evidence and you hear from the experts, you're going to have some questions as to why are you getting those sort of tests, spending that sort of money at that point when it's two weeks after this alleged accident.  There was no situation.  None of those doctors describe an emergent situation that she immediately needed to have a scan.  Did it change the way they handled the treatment of Mrs. Diaz?  Not at all.

What I'll submit to you is not too long after the accident, this thing split into two tracks. There's the real track, which is the real doctors who treated Mrs. Diaz, and then there is the litigation track. And that -- those tracks split apart and they've remained split apart, and the litigation track is ending here.

. . . And the key question, and again, it illustrates how things split into two tracks, real treatment and then litigation treatment.

Ms. Diaz was seen on July 12th after the accident -- so that's about three weeks later -- by her urologist Dr. Patel.[1] She had had two procedures already to her bladder before this accident. She's seen in a followup procedure -- one of the procedures was about a month before the accident. So she's seen in followup on July 12th by Dr. Patel. And, again, is there any mention of this terrible automobile crash, this getting hit by a tractor trailer? Is there any mention of any problems, back pain? There's no mention of any problem with her urinary symptoms at that point. It's a completely normal examination.

The first time there is a mention of anything in the regard to a problem that -- a worsening of what -- the problem that she had before is in August of 2015, more than a year later. And those notes say, yes, she had some exacerbation due to stress and that it began three months before. Not a year before. It began in 2015.

. . . Oh, yeah, I saw her a year after the accident and that's the first time she said she had a problem. Not three weeks after the accident. A year after the accident.

---

[1] Rupa Patel, M.D., Board Certified Urologist.

. . . And I think you're going to hear an awful lot of things when you hear the evidenced from the witnesses, from the documents, from the experts that common sense is going to tell you that something is wrong here. And if you get to that point, I think you're going to have to then consider, if that's not true, well, can I believe any of this.

. . . .

[The video] . . . five minutes of seeing somebody walking, talking, driving. And the significance of it is that it's completely normal. There is no evidence that Mrs. Diaz is having any problem. She's getting in and out of the car. She's bending over. She's doing -- she's turning left and right to drive her car. So there's no evidence which is consistent with the kind of claims that they are making in this lawsuit. And that's the point of that surveillance video.

. . . [T]he video shows that she does not appear to be guarding. . . . And there's not one bit of evidence of that.

. . . .

. . . [Y]ou're going to find that all of these things that they're claiming up on that board, you're going to have serious questions.

We are satisfied that this case fell within <u>Szczecina</u>'s prohibition regarding opening statements. The opening statement in this case did not just touch upon the basic facts of the case, it full-bore attacked plaintiff's credibility. This exceeded the legitimate purpose of an opening statement, in which cases are

described only in a general way, as to basic facts and what each party intends to present by way of evidence, or what the party anticipates the other side will admit by way of evidence.

Here, during his opening statement, defense counsel attacked plaintiff's credibility, beginning with the statement that "an accident is not an opportunity for financial gain." He discussed the specifics of anticipated testimony and the reasons it proves that she is untruthful. Counsel attacked the medical expenses and treatment as inflated and unnecessary. The statements counsel made were not verifiable, such as telling the jury that he thought plaintiff was going to present evidence the jury could fairly conclude was "wrong[,]" which should make them conclude none of it could be believed. This was improper, objectionable, should have been stricken from the record, and an instruction should have been given to the jury instructing them to ignore it.

In summation, counsel said:

> As I said at the beginning of this case, an accident is not necessarily -- it's not supposed to be an opportunity. . . .
>
> I believe that the credible evidence is going to show you that shortly after the accident of June 20th, 2014, as I mentioned in my opening, two tracks were created. We had a litigation or a claim, and then you had the real work. And that proceeded onward through all of the medical treatment that have [sic] happened

since then. And as you heard, there's a lot of medical treatment.

But the claim has taken on a life of its own during the course of this matter. And I believe it did become an instance where the plaintiffs viewed this as an opportunity as opposed to normal treatment for what actually happened to them.

This began, I think, at the hospital. She was seen at the hospital and she made complaints regarding her neck and her mid-back. There are no complaints regarding her shoulder. And those complaints were not so sufficient that they didn't even order an x-ray. They let her go.

. . . And she did see her family practitioner, in this case, the physician's assistant Janet Nikolic, one week after the accident. And as I pointed out at the beginning, and I think I tried to point out on the stand, when she saw Ms. Nikolic, Ms. Nikolic will tell you, no, she did not say anything in regard to an accident, she did not say anything in regard to pain in my shoulder, she did not say anything in regard to a neck or back.

Now, Ms. Diaz claims otherwise. She claims she told [Nikolic] all of those things. And that gets to the first or the biggest issue in this case, and that's credibility.

You have several issues where you're going to have to determine Mrs. Diaz's credibility. And I think if you look at what you heard, you're going to have to say it's not credible. First and foremost is that first visit.

. . . .

. . . But I would point to all of that as to evidence that what was going on was not active treatment of what really was going on with Mrs. Diaz. What was going on was a buildup of things for purposes of a claim.

. . . [T]he first visit they're ordering an MRI. The second visit they ordered the cervical MRI. Then they ordered a lumbar MRI. These all occur within one month of this accident.

. . . She went for the MRI which allegedly -- what Dr. Wayne will tell you showed tears, even though that's not what the radiologist said on her report. And Dr. Lifshutz did not then think that surgery was warranted because none of his records indicate that. And the mystery orthopedist obviously didn't think that surgery was warranted because I think you would have heard something about it.

. . . .

Instead, she's treating, she's treating, she's treating up until October. And then suddenly she's not treating for a month, and then she begins seeing Dr. Spiel.[2] Now, what does Dr. Spiel do? He essentially then starts it all over again.

He orders new MRIs. Now, both Dr. Spiel and Dr. Lane[3] claim, well, the first MRIs weren't that clear. Well, there was nothing in -- neither one of them said the second MRI showed them anything different. They basically said they confirmed what they saw in the first MRIs. But you had new MRIs, so it seems like something was happening here.

---

[2] Douglas Spiel, M.D., Board Certified Radiologist.

[3] Gregory Lane, M.D., Board Certified Orthopedic Surgeon.

She's sent to Dr. Lane. Dr. Lane examines her in January, sends her[] for that new MRI with contrast. . . . Dr. Lane does not see the plaintiff again for 14 months.

. . . The injections, according to the plaintiff's testimony, did nothing for her.

But they did make it seem like something was going on here, that there was some basis for the claim that they're trying to make. I would submit to you that was the only purpose for that -- those injections was to build up a claim, and for Dr. Spiel to bill. I believe that's -- if you look through all of the testimony, again, that was a driving force [of] the litigation in terms of her treatment.

. . . [I]t was based entirely on one report of Dr. Spiel and her belief that an injury to the lumbar spine, if it's at L1, L2 or L3, could have aggravated the incontinence. The fact is, there's not one doctor, not Dr. Spiel, not Dr. Lane, not Dr. Lifshutz[4] or any of the radiologists indicated -- has indicated that any of the films showed an injury to [Mrs.] Diaz's lumbar spine at L1, L2 or L3.

. . . .

So again, you have [] two tracks. She has real health issues and then she has the claims in this lawsuit.

. . . [A]fter those physical exams, after being deposed and giving testimony, goes back to Dr. Spiel and then they start a whole new round of treatment where Dr. Spiel suddenly is treating her lower back, which he had not treated at all before that.

---

[4] David Lifshutz, M.D., Neurologist.

A-4449-16T3

And then, suddenly, Dr. Lane, after a year and a half, sees the plaintiff and says, no, we're not going to do any shots, we're going to do an operation. Dr. Dennis[5] will tell you there was no reason for that operation, that what Dr. Lane found were fraying, [that] he basically debrided that fraying, that there were no real tears, because if there was a real tear, he would have had to do some sort of repair. There's staples. There's suturing. There's all sorts of other things that orthopedists will do. But that's a -- wasn't what was done here.

I know Dr. Lane will defend his reasoning. But, obviously if he goes in and doesn't find something, it would be that much more clear that he never should have gone in. He'll tell you that those MRIs -- he found tears where the radiologist did not find tears, because he had to justify the fact that he performed surgery on the plaintiff.

. . . .

[Y]ou're going to have to, at the end, reach a verdict which says, okay, something happened here, but it was not an opportunity for something. It was not the kind of claim that the plaintiff is making to you here today, that she did not sustain permanent serious injuries as a result of this accident, that the treatment she received was completely overblown and was done for one purpose, the purpose of trying to bring some sort of claim.

---

[5] Robert Dennis, M.D., Board Certified Orthopedic Surgeon.

In closing, defendants' counsel returned to the theme he developed during opening that plaintiff's medical treatment proceeded along "two tracks[.]" He mentioned treatment for "a litigation or a claim, and then you had the real work." Counsel suggested that the medical treatment took a life of its own because plaintiff saw it as an opportunity for pecuniary gain as opposed to normal treatment. He pointed out legitimate and real weaknesses in plaintiff's proofs in a fashion that bordered on suggesting she and her physicians were attempting to perpetrate a fraud. For example, he said that one of plaintiff's doctors described an MRI as showing tears, even though the radiologist's report did not corroborate that, and that multiple tests were ordered to make "it seem[] like something was happening here." Counsel referred to the fact defendants' expert did not see a need for shoulder surgery, adding that when a surgeon finds nothing despite having cut into a patient's body, it is important for him "to justify the fact that he performed surgery[.]" As counsel said when ending his closing, "the treatment [plaintiff] received was completely overblown and was done for one purpose, the purpose of trying to bring some sort of claim." At least some of the statements were objectionable.

Even before the decision in <u>Szczecina</u>, we said that in summation, counsel may not unfairly attack the adverse party's character and the integrity of the

A-4449-16T3

adverse party's experts, much less treating physicians. See Rodd, 373 N.J. Super. at 171-72. Arguably, suggesting that Dr. Lane misrepresented his findings in order to justify the surgery he performed on plaintiff was just such an attack. But defendants' expert did support that position, and most significantly, plaintiff's attorney did not object. The prejudice defendants created may have been ameliorated by a properly fashioned instruction. See Litton Indus. v. IMO Indus., 200 N.J. 372, 393-94 (2009). Since no objection was made, no curative instruction was given. The question is the same for both opening and closing statements—was the effect on the jury's verdict such that it was prejudicial plain error even in the absence of an objection. The answer to the question rests within the trial judge's analysis of the new trial motion.

Motions for a new trial are granted only when the trial judge, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, [] clearly and convincingly [concludes] that there was a miscarriage of justice under the law." R. 4:49-1(a). In deciding whether a new trial should be granted and whether the jury's verdict was clear error or mistake, a court weighs both tangible and intangible factors, credibility, and the feel of the case. See Hayes v. Delamotte, 231 N.J. 373, 385-86 (2018).

In deciding such motions, judges are expected to canvass the record to determine if there is adequate support for the verdict. Jury verdicts are set aside in favor of a new trial sparingly and only when a clear injustice has occurred. Jacobs v. Jersey Cent. Power & Light Co., 452 N.J. Super. 494, 502 (App. Div. 2017).

In this case, although we do not share the trial judge's view that defense counsel's commentary is the norm in civil cases, we ultimately agree that the proofs did not support plaintiff's claimed damages. Her testimony was at odds with the course of her medical treatment, the surveillance video, the lack of documented loss of work time, and her preexisting injuries. Some of her medical claims, such as that the accident exacerbated her urinary incontinence, a pre-existing condition, made her not only appear incredible, but may have caused the jury to essentially reject her case entirely. Her medical proofs were undercut by defendant's experts. In other words, when viewing the trial in its entirety, it appears that defense counsel's statements in opening and in closing, although in error, were not plain error so prejudicial to her case as to have resulted in a miscarriage of justice which warranted a new trial.

Our standard of review imposes on us the same obligation as the trial judge. We ask whether a miscarriage of justice under the law has occurred.

Hayes, 231 N.J. at 386. We cannot say, after having examined the record and considered the evidence, "that the continued viability of the judgment would constitute a manifest denial of justice." Id. at 385-86 (citing Risko v. Thompson Muller Auto Grp., Inc., 206 N.J. 506, 521 (2011)). We must give due deference to the trial judge's feel of the case. Id. at 386. Although we do not agree with her characterization of defense counsel's comments in opening and closing, we do agree that ultimately, as a matter of law, no plain error occurred that would have warranted a new trial.

Nor do we believe that the comments, and the court's failure to instruct the jury regarding them, were cumulative errors that mandate a new trial. No manifest injustice occurred.

## II.

With regard to plaintiff's argument that the exclusion of the unpaid medical bill and the ERISA lien warranted a new trial, the judge found that despite her requests she do so, plaintiff had been unable to clearly establish which medical bills had been supplied to counsel during discovery, or which bills had been paid. Plaintiff's counsel had not objected to the molding of the jury's verdict to include the ERISA lien. As she put it, the arguments regarding

the prejudice to the outcome wrought by her exclusion of the medical bills were unpersuasive.

The doctrine of plain error also applies with regard to the exclusion of the ERISA lien and Dr. Lane's medical bills. Counsel did not object to the exclusion of the medical bills. On multiple occasions throughout the proceedings before the trial, and even during the hearing the court conducted post-verdict regarding the amount of unpaid medical bills, counsel could not say with certainty which documents had been forwarded to defense counsel, the amounts still owed, or which were excluded from the ERISA lien.

Like all decisions regarding the admission of evidence, exclusion of the bills was discretionary with the court. Verdicchio v. Ricca, 179 N.J. 1, 34 (2004). Decisions regarding the admissibility of evidence will not be overruled so long as not equivalent to an abuse of discretion resulting in "manifest denial of justice." Ibid. (citing Green v. N.J. Mfrs. Inc. Co., 160 N.J. 480, 492 (1999)). If an evidentiary ruling is found to have been made in error, even then we reverse only if it was clearly capable of producing an unjust result. Manata v. Pereira, 436 N.J. Super. 330, 343-44 (App. Div. 2014).

In support of her argument, plaintiff now asserts that under N.J.S.A. 2A:15-97, a party is not restricted from introducing for the jury's consideration

evidence of the total amount of medical bills he or she has incurred. Regardless, the judge's suggestion with regard to the ERISA lien was accepted by plaintiff's counsel without objection at all. Just because plaintiff could have sought the admission of the medical bills as part of her case does not mean that her strategic decision not to do so made the judge's discretionary call error on the part of the court. Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 129 (1999) (plain error rule should be "sparingly employed" in civil cases).

With regard to Dr. Lane's bills, it is clear from the record that plaintiff could not say with certainty whether the bill was served on defense counsel during discovery, the amount of the bill, and any balance that was due. The judge was still requesting specifics even at the post-verdict hearing, and asking for documentation before conducting a second jury trial on the question. The statute would have permitted what plaintiff now seeks, but the record does not indicate if the amount in question was disclosed in the discovery process, after the trial began, and was uncertain even after the trial ended. As a result, we see no abuse of discretion in the judge's decision to exclude the medical bills from the jury's consideration.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4449-16T3