**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2505-23

MATTHEW MELTON and
ERIC FALKENSTEIN,

     Plaintiffs-Respondents,

v.

KENNETH NOVAK,

     Defendant-Appellant,

and

VALERIE CRAGAN and
ALEX L/N/U,

     Defendants.

_____

Argued February 12, 2025 – Decided May 5, 2025

Before Judges Marczyk, Paganelli, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-0830-22.

Michael Confusione argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael Confusione, of counsel and on the brief).

Josephine A. Marchitto argued the cause for respondents.

PER CURIAM

Defendant Kenneth Novak appeals from the final judgment entered on April 17, 2024, following a jury verdict finding him liable to plaintiffs Matthew Melton and Eric Falkenstein for breach of contract, malicious use of process, and abuse of process.[1]  The principal issue we address is whether plaintiffs' counsel's derisive remarks during opening and closing statements, in conjunction with her conduct during direct-examination of defendant, warrant a new trial.  Based on our review of the record and applicable legal principles, we conclude plaintiffs' counsel's conduct exceeded the bounds of permissible advocacy and unfairly prejudiced defendant's right to a fair trial.  Accordingly, we reverse and remand for a new trial.

We further address the issue of whether defendant's voluntary dismissal of the underlying temporary restraining order (TRO) against Matthew during

---

[1]  Because this matter involves various family members who share a surname (the Meltons and Falkensteins), we will address plaintiffs and their family members by their first names.  We intend no disrespect.

trial constituted a "favorable termination" to support Matthew's malicious use of process claim. Under the specific facts presented here, we are satisfied the voluntary dismissal was a favorable termination.

## I.

Fay Falkenstein, Eric's mother, owned a single-family home located in Toms River (the property). The property was a family home, where Eric had lived since approximately 1970. Fay died, leaving Alyssa Melton, her granddaughter, as the executrix of her estate. Under the terms of Fay's will, Alyssa was to sell the property, and fifty percent of the proceeds were to go to Eric, with the remaining fifty percent split between Eric's children, Matthew and Alyssa.

In July 2021, Alyssa, on behalf of Fay's estate, and defendant entered into a sales agreement for the property. The purchase price was $225,000. Paragraph nine of the sales agreement stated:

> [Defendant] shall be entitled to possession of the property . . . immediately upon delivery of the deed and closing of title. [Defendant] understands and agrees to accept the property with Eric . . . to remain on the premises rent free for a period of one year from the date of closing. [Defendant] shall be responsible for any costs incurred to remove [Eric] from the premises after the aforesaid agreed period.

Closing for the property took place on September 30, 2021.

During trial, defendant testified that he discovered Matthew had moved into the property prior to the closing, which upset him because it was his understanding that only Eric would be living in the home for the one-year period as set forth in the sales agreement. Defendant said he considered Matthew a "squatt[er]."

Eric testified he understood the sales agreement allowed him to remain in possession and control of the property for up to a year until he could find another place to live. Matthew testified he believed he could stay at the house "as long as" he was "helping clean up the house and helping [Eric] pack his belongings."

Before and after the closing, there was animosity between defendant and Matthew. Matthew testified he was upset about the sale of the property as he had grown up in the house. On October 23, 2021, the two had an altercation, and defendant claimed Matthew threatened to punch him. Defendant called the police and obtained a TRO against Matthew. In obtaining the TRO, defendant stated Matthew was his "household member." Matthew was subsequently removed from the property.

After the incident with Matthew, disputes arose between defendant and Eric. Defendant claimed Eric was "harassing" him, demanding he dismiss the restraining order against Matthew. He further claimed Eric threatened to "kill"

A-2505-23

him.  Eric testified defendant was the one harassing him and continually demanding he pack up his belongings faster.  On November 19, 2021, defendant obtained a TRO against Eric and, as a result, Eric was also removed from the property.

While plaintiffs were out of the property, defendant commenced renovations on the home.  He removed the ceiling, carpeting, appliances, sheetrock, and plumbing from the house.  All utilities were turned off.  At some point after both plaintiffs were out of the house, the City of Toms River condemned the property.

Defendant and Eric appeared in family court in January 2022 for a final hearing on the restraining order.  The family judge denied the final restraining order (FRO), finding that defendant and Eric were not roommates and thus were not members of the same household as required to issue a restraining order.  See N.J.S.A. 2C:25-19(d).[2]  A few weeks later, defendant voluntarily dismissed the TRO against Matthew after that trial had commenced.

---

[2] "'Victim of domestic violence' means a person protected under this act . . . who has been subjected to domestic violence by a spouse, former spouse, or any other person who is a present household member or was at any time a household member."  N.J.S.A. 2C:25-19(d).

In or around March 2022, defendant filed a landlord-tenant action in an attempt to permanently remove Eric and Matthew from the property. As a result of those proceedings, the parties agreed plaintiffs would go to the property on April 9, 2022, to collect the rest of their belongings.

When plaintiffs arrived at the property, they discovered some of their items were in the backyard under a tarp, and many items were missing. In addition, plaintiffs' storage container was missing from the driveway. Plaintiffs testified that when they contacted the storage company, they were told someone had called to have the container removed. Although plaintiffs were eventually able to recover the container, many items were damaged during transport because they had not finished packing.

Plaintiffs filed a complaint against defendant in April 2022, alleging breach of contract (count one), breach of contract and tortious interference with contractual relations (count two), tortious activity against plaintiffs (counts three

6

to five), malicious prosecution[3] and abuse of process[4] stemming from the alleged wrongful institution of the TRO proceedings (counts six, seven, and thirteen),[5] wrongful ejectment (counts eight and nine), destruction of contract corpus (count nine),[6] wrongful distraint (count ten), consequences of wrongful distraint (count eleven), and wrongful distraint and destruction of personal property (count twelve). Defendant answered and asserted a counterclaim for breach of contract.

A three-day jury trial took place in April 2024. Plaintiffs were represented by counsel, and defendant appeared pro se. During the trial, plaintiffs disputed defendant's status as a "household member." Defendant testified the sales

---

[3] "Malicious use of process is essentially the analog [of malicious prosecution and is] used when the offending action in question is civil rather than criminal." LoBiondo v. Schwartz, 199 N.J. 62, 89-90 (2009). Despite this distinction, the model jury charge uses the language "Malicious Prosecution Based Upon a Prior Civil Proceeding." Model Jury Charge (Civil), 3.13 (approved before 1984). We will refer to this cause of action in this opinion as "malicious use of process" to avoid any confusion.

[4] As discussed more fully below in footnote ten, abuse of process is a related, though separate and distinct tort.

[5] The complaint contained two count thirteens for abuse of process and malicious prosecution.

[6] The complaint also contained two count nines, one for wrongful ejectment, and another for destruction of contract corpus.

A-2505-23

agreement granted him the right to live in the property with Eric because it entitled him to immediate possession. On the other hand, Eric testified that when defendant obtained the restraining order against him, defendant "had never spent a single night in that home." Rather, Eric and Matthew contended defendant continued to live with his aunt, in a house immediately adjoining the property. Matthew conceded, however, that after defendant obtained a TRO against him, his father said defendant "moved in like a couple nights after that" and slept at the property somewhere between two to four times, which would have been prior to defendant's obtaining the TRO against Eric.

At the charge conference, the court found no evidence had been introduced to support plaintiffs' tortious activity claims. The court also determined the facts supporting the wrongful ejectment and destruction of contract corpus claims were incorporated in the breach of contract claim. As for plaintiffs' claims of wrongful distraint and consequences of wrongful distraint, the court found the facts were more akin to a claim of destruction of personal property. Accordingly, the court instructed the jury on the claims for breach of contract, malicious use of process, abuse of process, and destruction of personal property.[7]

---

[7] The court dismissed the remaining counts.

A-2505-23

The jury returned a verdict in favor of Eric on the breach of contract claim, awarding him $20,000. The jury also found in favor of both plaintiffs on the malicious use of process and abuse of process claims and awarded them $200,000 each. The jury did not find defendant wrongfully damaged plaintiffs' personal property. The court entered an order confirming the judgment on April 17, 2024.

## II.

On appeal, defendant argues he was deprived of a fair trial because plaintiffs' counsel made improper, prejudicial comments and engaged in improper conduct throughout trial. Defendant further asserts there was legally insufficient evidence supporting the malicious use of process claim and that the court erred when instructing the jury on this claim. Lastly, defendant claims the damages awarded by the jury on the malicious use of process and abuse of process claims were excessive.

## A.

Defendant argues plaintiffs' counsel made numerous prejudicial statements in her opening argument, while cross-examining defendant, and in her summation. He asserts the cumulative effect of counsel's comments warrants a new trial.

A-2505-23

"Jury verdicts should be set aside in favor of new trials only with great reluctance, and only in cases of clear injustice." Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005). "Neither trial nor appellate courts may grant a new trial unless it clearly appears there was a miscarriage of justice." Ibid.; see R. 2:10-1. While an innocuous error is generally insufficient to warrant a new trial, the cumulative effect of numerous errors may deprive a party of a fair trial and require a new trial. See Morales-Hurtado v. Reinoso, 457 N.J. Super. 170, 190-91 (App. Div. 2018).

Although trial counsel is generally afforded "broad latitude" when making arguments because an attorney is an advocate and, thus, "expected to be passionate," judges must intervene when statements "cross the line beyond fair advocacy and comment, and have the ability or capacity to improperly influence the jury's ultimate decision making." Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011) (citations and internal quotation marks omitted). This includes "[u]nfair and prejudicial appeals to emotion," and "insinuations of bad faith on the part of [those] defendants who sought to resolve by trial validly contested claims against them." Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009) (first alteration in original) (quoting Geler v. Akawie, 358 N.J. Super. 437, 468-69 (App. Div. 2003)). In short, arguments made during

"[s]ummations must be 'fair and courteous, grounded in the evidence, and free from any potential to cause injustice.'" Risko, 206 N.J. at 522 (quoting id. at 504-05).

Counsel may draw conclusions for the jury, even if they are absurd, but they "may not 'misstate the evidence nor distort the factual picture.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)). In other words, an attorney should not

> allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused.
>
> [Morales-Hurtado, 457 N.J. Super. at 189 (quoting RPC 3.4(e)).]

"It is [also] improper for an attorney to interject personal assertions or opinions while interrogating witnesses." Ibid. Counsel should refrain from making disparaging remarks to discredit an opposing party or witness. See Rodd v. Raritan Radiologic Assocs. P.A., 373 N.J. Super. 154, 171 (App. Div. 2004).

"Where the jury has heard a statement from counsel or a witness that is irrelevant, inadmissible, or otherwise improper and also has the capacity for prejudice, the court's curative instruction must be prompt and sufficient to

11

overcome the potential prejudice." Pressler & Verniero, Current N.J. Court Rules, cmt. 9.2 on R. 1:8-7 (2024). "[A] clear and firm jury charge may cure any prejudice created by counsel's improper remarks during opening or closing argument." City of Linden v. Benedict Motel Corp., 370 N.J. Super. 372, 398 (App. Div. 2004). This is especially the case where the sole issue before the jury is credibility, and improper comments may impact the jury's assessment on that critical issue. See Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 30 (App. Div. 1998).

However, where no objection is made by the opposing party, and thus, no curative instruction requested, the plain error standard of review applies. City of Linden, 370 N.J. Super. at 397; see also Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 128 (2008). Plain error is error that which "was 'clearly capable of producing an unjust result,' . . . that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (internal citation omitted) (first quoting R. 2:10-2; then quoting State v. Funderburg, 225 N.J. 66, 79 (2016)).

Defendant presents a litany of comments made by plaintiffs' counsel he asserts were improper. We address these remarks in turn. During opening

statements, plaintiffs' counsel asserted defendant committed libel and slander. This comment was improper because the complaint did not plead libel or slander, and the jury was not instructed on libel and slander. Plaintiffs' counsel also implied defendant was possibly involved in the theft of Eric's truck, which was stolen on the date he was going to collect his items from the property and used in an armed robbery. Plaintiffs' counsel also stated defendant "used somebody else's social security number" to remove plaintiffs' storage container from the property. We determine these comments implied criminal conduct by defendant and were not based on allegations in the complaint or facts presented at trial relevant to the breach of contract or malicious use of process claims.

Plaintiffs' counsel also stated plaintiffs would present testimony from defendant's real estate counsel who negotiated the sales agreement and who defendant allegedly fired before the closing. Counsel asserted defendant's prior counsel would "have to break confidentiality" and then stated she could figure out what the attorney told defendant, which was to, "[s]tay away [from plaintiffs]. They got to move. Leave them alone."

This comment was improper because defendant's attorney was never called as a witness. Also, defendant testified he did not fire his attorney, and the attorney was present at the closing. Plaintiffs did not rebut that testimony.

A-2505-23

Plaintiffs' counsel further stated, in commenting on the breach of contract action, that defendant's conduct constituted "theft" and "burglary" despite no criminal charges having been filed stemming from the dispute.

Perhaps more egregious were plaintiffs' counsel's comments during her opening statement that defendant "looks very unassuming.  He looks like a nice guy. . . .  But he's not. . . .  This man is a fiend.  This man is a monster."  She also alleged five prior judges in the domestic violence cases "all called him a liar."  No such evidence was produced at trial, and there is no indication any judge called defendant a liar.

There were also numerous instances when plaintiffs' counsel, despite being admonished by the court, responded to defendant's answers during her questioning of him, essentially attempting to testify herself regarding the facts as she understood them.  For example, shortly after counsel was told to not respond to defendant's answers as if she was a witness,[8] the following exchange took place:

> [Plaintiffs' counsel]      . . . Now you were told that all
> that meant is that you owned the house. . . .  Throughout
> all this negotiation—and I've got your answers to

---

[8] The court advised plaintiffs' counsel:  "It is totally inappropriate for you to respond as if you're a witness with personal knowledge.  Unless you're going to make yourself a witness, at which time you will be disqualified from representing anybody in this case."

14

interrogatories. In your answers you said that you left the closing . . . and immediately went to the home and said, "I'm here. I own this place," and it was your right to take possession and ownership. Correct?

[Defendant]       I never said that.

[Plaintiffs' counsel]      Yes, you did.  It's in your – You're saying right here that you had the right to be in that house.

[Defendant]       If you could show me where I said it.

[Plaintiffs' counsel]      You just said it now, that you took – you owned the house.

Counsel was again reminded that she was not testifying and that she had to allow the witness to answer the question.  The court stated, "[y]ou may not like his answers, but this isn't an opportunity simply to argue with this witness."   The court advised counsel she could refute the testimony later if she had other witnesses.

Counsel's improper conduct continued, and the trial court once again admonished counsel for interjecting her comments in response to answers she did not like.  The court appropriately advised plaintiffs' counsel it had a duty to protect the record, and her comments during the direct examination of defendant were inappropriate.  Counsel nevertheless continued interposing her comments and arguing with defendant.  At one point, when counsel was dissatisfied with

15

defendant's response to a question she stated, "[h]e knows more than he's letting on" before being interrupted by the court.

Plaintiffs' counsel's improper comments extended to her summation, in which she improperly referred to transcripts that were not in evidence. She stated she "wish[ed]" she could have given the jury the transcripts from the FRO hearings, but they were not admitted by the court. The implication is clear— had the trial judge admitted the evidence it would have been helpful for plaintiffs' case. It is fundamental that a party may not comment to the jury on evidence excluded by the court. See Diakamopoulos, 312 N.J. Super. at 32-33. Further, she continued with her use of invectives calling defendant a "gadfly" and a "pest's pest." She further stated defendant "absolutely is without a redeeming quality."

In Szczecina v. PV Holding Corp., we addressed the plaintiff's counsel's "clearly inappropriate" comments during opening and closing statements and determined they exceeded the bounds of permissible advocacy and warranted a new trial. 414 N.J. Super. 173, 175 (App. Div. 2010). Counsel there "attacked the integrity" of the defendants, defense counsel, and other defense witnesses during his opening statement and continued the "inflammatory attacks" in summation. Id. at 177-78. Specifically, counsel repeatedly referred to the

defense experts as "spin doctors," "hired guns," "paid agreers" and accused them of intentionally muddying up the waters.  Id. at 180.

We stated, "it is improper for an attorney to make derisive statements about parties, their counsel, or their witnesses."  Id. at 178.  We clarified that "[a]lthough attorneys are given broad latitude in summation, they may not use disparaging language to discredit the opposing party, or witness."  Ibid. (quoting Rodd, 373 N.J. Super. at 171).  Referencing our decision in Geler, we observed:

> "[a]n attack by counsel upon a litigant's character or morals, when they are not in issue, is a particularly reprehensible type of impropriety."  Paxton v. Misiuk, 54 N.J. Super. 15, 22 (App. Div. 1959).  Nor can parties and witnesses be made the target of invective and derogation. . . .  Reasoned analysis of the evidence and the credibility of testimony is one thing; wholesale disparagement through an unrestricted deluge of epithets is another. . . .  This is so, because of the tendency of such comments "to instill in the minds of the jury impressions not founded upon the evidence."  Botta v. Brunner, 26 N.J. 82, 98 (1958).
>
> [Szczecina, 414 N.J. Super. at 179 (citations reformatted) (quoting Geler, 358 N.J. Super. at 467).]

In Szczecina, we further determined courts "ha[ve] an affirmative duty to intervene . . . to ensure that a fair trial is received by the parties" even in the absence of an objection.  Id. at 185.  We explained, "[o]ur courts have long rejected the arbitrary and artificial methods of the pure adversary system of

17

litigation which regards the lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed." Ibid. (alteration in original) (quoting Hitchman v. Nagy, 382 N.J. Super. 433, 453 (App. Div. 2006)). Furthermore, we commented:

> We should not be understood to imply that a trial judge should interfere generally with trial tactics employed by counsel when there is no objection. We appreciate the importance of letting the attorneys "try their own cases." However, when counsel engages in patently inappropriate conduct, such as derisive statements and other invectives aimed at opposing parties, counsel or witnesses, or when there is an inappropriate request to "send a message," the trial judge should act before the situation reaches the point at which an unjust result is likely or even possible. Attorneys who engage in this type of conduct risk losing a favorable jury verdict, even if there is no objection.
>
> [Ibid.]

Counsel's comments during her opening statement and summation were egregious and well beyond the bounds of appropriate conduct. Rather than discussing what the evidence would show, counsel interjected personal character attacks on defendant. See Manzi v. Zuckerman, 157 N.J. Super. 63, 66 (App. Div. 1978) ("The purpose of [opening] statements is to do no more than inform the jury in a general way of the nature of the action and the basic factual hypothesis projected, so that they may better be prepared to understand the

evidence." (quoting Farkas v. Middlesex Bd. of Freeholders, 49 N.J. Super. 363, 367-68 (App. Div. 1958))).

The disparaging remarks were not isolated, fleeting, or stray comments. Rather, they were part of a pervasive theme advanced by plaintiffs' counsel in both opening and closing arguments. The court intervened during the trial regarding the improper statements made by plaintiffs' counsel when questioning defendant. However, even in the absence of any objection by the self-represented defendant, the court had an obligation to intervene under Szczecina when plaintiffs' counsel used disparaging language to attack defendant during opening and closing statements.

Plaintiffs' counsel overstepped the bounds of permissible comment. Her conduct was clearly capable of producing an unjust result. Although the court gave the standard jury instructions regarding the arguments of counsel not being binding, the nature and impact of counsel's comments were not cured by that instruction and were ineffective to purge the taint of prejudice from counsel's improper and overzealous commentary. See Szczecina, 414 N.J. Super. at 184-85. Cautionary instructions have little effect to cure jury prejudice resulting from the "repeated exposure of a jury to prejudicial information." Geler, 358 N.J. Super. at 471 (quoting City of Cleveland v. Peter Kiewit Sons' Co., 624

F.2d 749, 759 (6th Cir. 1980)). "[W]here an attorney persists in making unwarranted prejudicial appeals to a jury which taint the verdict," reversal is necessary because the comments have the capacity to improperly influence the jury's ultimate decision-making, both in the amount of the verdict as well as the defendant's share of liability. Hofstrom v. Share, 295 N.J. Super. 186, 193 (App. Div. 1996).

In addition to the impropriety of counsel's pejorative remarks during opening and closing statements, counsel's back-and-forth arguments with defendant and statements made while questioning him were improper for a variety of reasons, including because counsel cannot "assert personal knowledge of facts in issue." Morales-Hurtado, 457 N.J. Super. at 189 (quoting RPC 3.4(e)). Counsel can certainly comment on the evidence, but she may not offer personal opinions regarding the character of a party or "the credibility of a witness [or] the culpability of a civil litigant." Ibid. (quoting RPC 3.4(e)).

We are satisfied defendant did not receive a fair trial. Accordingly, we vacate the jury's verdict and reverse and remand for a new trial. In light of our determination, we will nevertheless consider defendant's remaining contentions to provide guidance for a retrial.

A-2505-23

B.

Defendant also argues there was legally insufficient evidence to support a malicious use of process verdict. He asserts there was no favorable termination of the underlying action against Matthew because the TRO was voluntarily dismissed. He also contends Matthew could not demonstrate he suffered a special grievance because he had no legal right to be in the home. Additionally, he maintains he had probable cause to file the TRO because living together is not a requirement for filing a restraining order. Relatedly, defendant argues the trial court erred in its jury charge by instructing the jury that living together was a requirement to obtain a TRO.

Malicious use of process provides a remedy for harm caused by the institution or continuation of a civil action that is baseless. LoBiondo, 199 N.J. at 89-90. Courts generally disfavor claims for malicious use of process as it can be difficult to distinguish between a plaintiff who is naive and one who is a wrongdoer. Tedards v. Auty, 232 N.J. Super. 541, 549 (App. Div. 1989); see also Mayflower Indus. v. Thor Corp., 15 N.J. Super. 139, 153 (Ch. Div. 1951) (noting "[e]xtreme care must be exercised" to prevent discouragement of legitimate suits). Our courts consider these claims "with great caution because of their capacity to chill resort to our courts by persons who believe that they

21

have a criminal complaint or civil claim against another." LoBiondo, 199 N.J. at 89. That cautious approach is especially appropriate when the civil action is commenced under the Prevention of Domestic Violence Act (PDVA). The PDVA is "particularly solicitous of victims of domestic violence" because the purpose of the "Act is to assure the victims of domestic violence 'the maximum protection from abuse the law can provide.'" State v. Hoffman, 149 N.J. 564, 584 (quoting N.J.S.A. 2C:25-18).

The elements of a claim for malicious use of process are: (1) a civil action was instituted by the defendant against the plaintiff; (2) "the action was motivated by malice"; (3) there was no probable cause for the action; (4) "the action was terminated favorably to the plaintiff"; and (5) "the plaintiff suffered a special grievance by the institution of the" action. LoBiondo, 199 N.J. at 90.[9]

In Piper v. Scher, we addressed whether, in a malicious prosecution

---

[9] An "action for abuse of process," on the other hand, "lies for the improper, unwarranted, and perverted use of process after it has been issued." Earl v. Winne, 14 N.J. 119, 135 (1953) (emphasis added) (quoting Ash v. Cohn, 119 N.J.L. 54, 58 (E. & A. 1937)). "[P]rocess has not been abused unless after its issuance the defendant reveals an ulterior purpose [the defendant] had in securing it by committing 'further acts' whereby [the defendant] demonstrably uses the process as a means to coerce or oppress the plaintiff." Tedards, 232 N.J. Super. at 550 (quoting Gambocz v. Apel, 102 N.J. Super. 123, 130-31 (App. Div. 1968)).

action, the defendant's voluntary termination or abandonment of the underlying criminal action, in the absence of an agreement or other prejudicial misconduct by the plaintiff, constituted a favorable termination[10] of the criminal proceeding. 221 N.J. Super. 54, 56 (App. Div. 1987). We answered that question in the affirmative. Ibid. Although Piper involved a malicious prosecution claim in the context of a dismissed underlying criminal case, the attending analysis is instructive in this matter.

In Piper, we distinguished Mondrow v. Selwyn, 172 N.J. Super. 379 (App. Div. 1980), where we determined that a withdrawal or dismissal of the underlying proceeding pursuant to a compromise or agreement was insufficient to establish a favorable termination. 221 N.J. Super. at 58. We noted:

> When one considers that such an action may take place after the plaintiff has been subjected to arrest, fingerprinting, photographing, adverse publicity, the

---

[10] The abuse of process claim is not germane to our discussion regarding the favorable termination of the FRO because one of the fundamental distinctions between malicious use of process and abuse of process claims is that abuse of process does not require a plaintiff to demonstrate the underlying case terminated favorably for the plaintiff. Ash, 119 N.J.L. at 58. Moreover, although not raised on appeal, we observe the trial court appears to have combined malicious use of process and abuse of process in the same jury interrogatory. The torts have different elements and it is not clear whether the jury ultimately found defendant liable for malicious use of process, abuse of process, or both. On remand, the court should charge the jury on each cause, if the counts remain at the close of all the evidence, and the torts should be separately addressed on the jury verdict form.

hiring of counsel, preparation for trial and the like, with their attendant stresses, the unfairness of such a proposition is clearly revealed. <u>Mondrow</u> simply did not address the precise issue presented here and consequently the trial judge erred in applying the holding in that case. In our view, where the defendant independently and unilaterally withdraws a prosecution otherwise maliciously filed without probable cause, and said action takes place independently of any agreement or misconduct by or request of the plaintiff, a malicious prosecution action may be sustained if the necessary special grievance is demonstrated.

[<u>Id.</u> at 59.]

Here, defendant independently and voluntarily dismissed the TRO with no indication of any duress, or pressure exerted by Matthew. Defendant purportedly dismissed the case during trial because he "was trying to be amicable with" Eric—not Matthew. Accordingly, because defendant dismissed the case on his own volition, we are unpersuaded by defendant's argument there was not a favorable termination of the domestic violence proceeding against Matthew. Thus, we discern no error in the trial court's instructing the jury it must find the underlying case against Matthew was terminated favorably for him.

Defendant next argues Matthew failed to demonstrate a special grievance because he had no right to reside in the home. A special grievance is an interference with a person's liberty or property. <u>Penwag Prop. Co. v. Landau</u>,

24

148 N.J. Super. 493, 501 (App. Div. 1977). Examples of a special grievance "are the appointment of a receiver, filing of a petition in bankruptcy, granting of an injunction, issuance of a writ of attachment or writ of replevin, filing of a lis pendens, issuance of an order of arrest, [and] wrongful interference with possession or enjoyment of property." Ibid.

Defendant claimed Matthew was a "squatt[er]," and the sales agreement only permitted Eric to live in the home. However, as the trial court advised the jury, paragraph nine of the sales agreement stated that Eric could "remain" in the home but was silent as to whether that use would be exclusive, or whether Eric could invite other individuals, such as his son Matthew, to reside in the home. It left that issue for the jury to resolve. Based upon the evidence presented at trial, the jury could have found Matthew was permitted to live in the home.

Once both plaintiffs were out of the home, defendant placed their personal belongings outside and stripped the house down to the studs. Matthew spent months without access to the property as he was removed from the house in October 2021 and did not regain some of his personal property until April 2022. Plaintiffs also alleged defendant removed their storage container without their permission or their ability to secure the contents, resulting in damage to their

property. Because the TRO resulted in Matthew's removal from the property, there was arguably a wrongful interference with Matthew's possession or enjoyment of property. See Penwag Prop. Co., 148 N.J. Super. at 501. The wrongful deprivation of Matthew's possessory rights to the home was sufficient to establish a special grievance.

Defendant further argues there was probable cause[11] for the TROs because "living in the home is not required to obtain a [TRO] or to seek" an FRO and, since defendant was a "household member," he had sufficient probable cause to seek the TROs. Moreover, he contends that the trial court erred when it charged the jury on this issue and stated that "living together" was a requirement to obtain a TRO. We first address the court's alleged error in charging the jury.

N.J.S.A. 2C:25-19(d) defines a victim of domestic violence as "any person who is 18 years of age or older . . . and who has been subjected to domestic violence by . . . any other person who is a present household member or was at any time a household member." Although "household member" is not defined

_____

[11] Probable cause in the context of a malicious use of process claim focuses on whether "in the prior suit, the facts supported the actor's 'honest belief' in the allegations." LoBiondo, 199 N.J. at 93. In other words, the defendant must have had "a reasonable belief that there was a good or sound chance of establishing the claim to the satisfaction of the court or the jury." Ibid.

under the statute, this jurisdictional requirement is viewed liberally to "assure the victims of domestic violence the maximum protection from abuse the law can provide" in accordance with the PDVA's intent. S.P. v. Newark Police Dep't, 428 N.J. Super. 210, 222 (App. Div. 2012) (quoting N.J.S.A. 2C:25-18). Indeed, a previous version of the statute was amended to remove the requirement that a victim of domestic violence had "cohabitat[ed]" with the defendant, "thus expanding the protections of the PDVA to more potential victims." Id. at 224.

In S.P., we discussed the test utilized in Hamilton v. Ali, 350 N.J. Super. 479, 486 (Ch. Div. 2001), where the court set forth the following factors, by way of example and not limitation, to consider in determining whether the facts establish a "family-like setting" sufficient to support jurisdiction:

> 1. Constancy of the relationship.
>
> 2. Over-night stays at each other's residence.
>
> 3. Personalty items such as jewelry, clothing and personal grooming effects stored at each other's residences.
>
> 4. Shared property arrangements, such as automobile usage, access to each other's bank accounts and one mailing address for billing or other legal purposes.
>
> 5. Familiarity with each other's siblings and parents socially in dining and/or entertainment activities together, and/or attendance together at extended family

27

functions such as weddings.

[S.P., 428 N.J. Super. at 225.]

Here, the trial court instructed the jury in its charge that living together was a requirement for obtaining a TRO:

> Third, the plaintiff must establish lack of reasonable or probable cause for the civil suit. In other words, the reasons why they instituted it. On this subject there is a sharp conflict in the proofs. The plaintiff contends that there was a lack of reasonable or probable cause and the defendant contends that there was a reasonable or probable cause for instituting this civil suit. In this case the plaintiff contends, one, that . . . he was not living there, which is an element that needs to be present in the institution of a domestic violence complaint. . . . [N]ot everybody can file a domestic violence complaint. So in this case he alleged they're roommates basically. They were living together. If you're not living together, you can't even file that suit.

Because we are remanding for a new trial, we direct the court not to utilize the "living together" language, but to instead instruct the jury using the language set forth in N.J.S.A. 2C:25-19(d) ("[A]ny other person who is a present household member or was at any time a household member") and use guidance from the above case law to tailor the instruction to the evidence presented at the new trial.

Importantly, the cases filed by defendant against Eric and Matthew were

both dismissed in the family court—one through a court's decision following trial and the other voluntarily by defendant. Therefore, the ultimate question for the jury in this matter on remand, regarding the malicious use of process claim, is not whether defendant was in fact a present or former household member. Rather, the jury must determine whether defendant had "reasonable or probable cause" to file a TRO application and whether he acted with a "malicious motive" in filing the complaint. Model Civil Jury Charges (Civil), 3.13.

We decline to address defendant's argument that he had probable cause to file the TRO because that goes to the weight of the evidence, and defendant never filed a motion for a new trial. Rule 2:10-1, "requires a new trial motion to have been made in the trial court as a prerequisite to an appellate challenge to a jury verdict on weight-of-evidence grounds." Pressler & Verniero, cmt. 3 on R. 2:10-1. Defendant may, of course, raise these arguments at the new trial.

Finally, because we are vacating the jury verdict and remanding for a new trial on liability and damages, we need not address defendant's argument that the damages award was excessive and grossly disproportionate to the evidence adduced at trial.

The jury verdict is vacated, and the matter is remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-2505-23